Del DIETRICH, individually and on behalf of all others similarly situated, Plaintiff,

v.

Richard BAUER; Groupe Scorpion, B.V.; Green–Cohn Group; Morton Cohn; Van D. Greenfield; CS First Boston; Smith, Benton & Hughes, Inc.; Michael Zaman; Claudia Zaman; Emmet A. Larkin & Company; Edward Fisch; Barry Witz; Mario V. Andrade; Westfield Financial Corporation; Idata, Inc.; Robert Bogutski; and Kathleen Bogutski, Defendants.

No. 95 Civ. 7051(RWS).

United States District Court, S.D. New York.

Jan. 8, 2001.

Lieff, Cabraser, Heimann & Bernstein, New York, NY, Rebecca M. Katz, Steven E. Fineman, of counsel, Lieff, Cabraser, Heimann & Bernstein, San Francisco, CA, Richard Heimann, of counsel, Goodkind Labaton Rudoff & Sucharow, New York, NY, James W. Johnson, of counsel, Starr & Holman, New York, NY, Zachary Alan Starr, of counsel, for Plaintiff.

Lankler Siffert & Wohl, New York, NY, Frank H. Wohl, Daniel E. Reynolds, of counsel, for Defendant Morton Cohn.

## OPINION

SWEET, District Judge.

Defendant Morton Cohn ("Cohn") has moved for summary judgment to dismiss the class action complaint of plaintiff Del

Dietrich ("Dietrich") as to Cohn, pursuant to Federal Rule of Civil Procedure 56. Dietrich has opposed the motion and has moved to strike certain evidence presented by Cohn in support of his motion for summary judgment. For the reasons set forth below, the motion for summary judgment is denied, as is the motion to strike.

### The Parties

The parties in this action are set forth in this Court's prior opinion of March 4, 1999, familiarity with which is assumed. *See Dietrich v. Bauer*, 76 F.Supp.2d 312 (S.D.N.Y.1999) (*"Dietrich I"*).

### Prior Proceedings

This action was commenced by the filing of a complaint on August 28, 1995 by Dietrich and has proceeded in the wake of a related action *In re Scorpion Technologies, Inc. Sec. Litig.*, No. C–93–20333, 1994 WL 774029 (N.D.Cal.).

In the second amended complaint, filed April 20, 1999, Dietrich alleges, *inter alia*, that the defendants engaged in a scheme to sell unregistered shares of Scorpion Technologies, Inc. ("Scorpion") in the United States, which shares had purportedly been issued pursuant to Regulation S,[1] promulgated under the Securities Act of 1933, and to manipulate the trading price of the Scorpion shares. Dietrich alleges that defendant Green–Cohn Group, Inc. ("Green–Cohn"), a registered broker-dealer, acted as the conduit through which nearly 11 million shares of unregistered Scorpion stock were sold by foreign entities to investors in the United States, and that Green–Cohn reaped substantial profits from these sales by being allowed to charge grossly excessive commission rates on the trades. Dietrich further alleges that Cohn is liable for these illegal activities as a "control person" of Green–Cohn, pursuant to Section 20(a) of the Securities Exchange Act of 1934 (the "1934 Act"), 15 U.S.C. § 78t(a), and that Cohn is also lia-ble for common law fraud and for securities fraud pursuant to the California Corporations Code, *see* Cal. Corp.Code §§ 25400, 25500 (West 2000).

The surviving claims in this action include primary liability claims under Section 10(b) of the 1934 Act, SEC Rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated thereunder, and common law fraud, against defendant Green–Cohn Group, Inc., and a controlling person liability claim under Section 20(a) of the 1934 Act, 15 U.S.C. § 78t(a), and pendent state law claims, against Cohn. *See Dietrich I*, 76 F.Supp.2d 312 (dismissing as to first amended complaint certain federal law claims against certain defendants and dismissing but granting leave to replead state law claims).

The parties have engaged in discovery, exchanging documents and deposing witnesses. Cohn's motion for summary judgment was filed on June 2, 2000, Dietrich's motion to strike was filed on August 1, 2000, and oral argument was heard on September 27, 2000, at which time these matters was deemed fully submitted.

### The Facts

The facts set forth below are gleaned from the parties' Rule 56.1 statements, affidavits and exhibits, with any factual inferences drawn in the non-movant's favor. They do not constitute findings of fact by the Court.

In January 1990, Cohn, a Texas resident, entered into a relationship with Greenfield in which Greenfield would manage an investment by Cohn of $2.6 million. Before forming Green–Cohn as a New York corporation doing business as a broker, Greenfield had discussions with Cohn concerning the formation of Green–Cohn as a company.

Cohn was the sole owner of Green–Cohn, owning 100% of its stock and contributing 100% of the equity in the firm.

---

**1.** Regulation S contains the SEC rules governing offers and sales of stock made outside of the United States without registration un-der the 1993 Act. *See* 17 CFR § 230.901 *et seq.*

According to Greenfield, Cohn was also an incorporating director of Green–Cohn and continued as a director. Cohn maintains that he has no recollection of being a director, and no documents have been submitted to establish his service as such. The broker-dealer registration form for Green–Cohn identifies Cohn as a control person. Greenfield was the president of Green–Cohn. Cohn designated Greenfield to run Green–Cohn as its registered representative.

Green–Cohn had offices in New York which Cohn visited during the period in which the alleged fraud involving the Scorpion stock was occurring. Cohn and Greenfield talked monthly and met once or twice a year during the relevant time period. On occasion, Green–Cohn used the address of Cohn's office in Houston as the address for Green–Cohn. Cohn paid Greenfield $30,000 a month for Green–Cohn operating expenses and overhead.

A photocopy of a letter from Greenfield to Cohn dated January 4, 1991 (the "January 4 Letter") states that Greenfield would "unilaterally make all management, employment and trading decisions of [Green–Cohn]" and would "have total control over the entity and its management," and that Cohn had no authority to fire Greenfield from his post as president of the company. No original of the letter has been furnished. Dietrich has submitted an affidavit from an expert challenging the letter's authenticity based on forensic evidence. Greenfield testified that he did not know if he ever sent the letter to Cohn and that he only provided the photocopy to Cohn within the couple of months preceding Greenfield's deposition on February 9, 2000. Although the letter states that Cohn is 100% owner of Green–Cohn, Cohn testified at his deposition that he did not know he was the owner of the firm or even that there was a firm called Green–Cohn, as well as that he had no recollection of the letter.

Green–Cohn submitted its procedural manual as required to the National Association of Securities Dealers ("NASD"). According to expert testimony, Green–Cohn violated its own procedural manual, the NASD and SEC rules and industry practice with respect to opening new accounts, documentation, customers orders, short-selling, the opening of foreign accounts and its trading in Scorpion stock.

Greenfield provided monthly accounting statements to Cohn, and Cohn received these statements, which were kept at Cohn's office. Greenfield also had discussions with Cohn's accountant, who worked out of Cohn's office, regarding Cohn's investment. Greenfield has submitted an affidavit in which he states that his oral and written reports to Cohn did not describe particular investments and did not discuss Scorpion technologies. Cohn "think[s]" that the statements he received reflected the specific investments made by Greenfield, "assume[s]" that the statements included such information because Greenfield acted as a money manager for him and "money managers basically will tell you where they've invested [your money]," and "vaguely" recalls seeing such statements. In November 1999, Dietrich served a document request on Cohn seeking, *inter alia*, documents concerning transactions in Scorpion stock, Cohn's investment in Green–Cohn, Cohn's relationship with Greenfield, and the financial condition of Green–Cohn. Cohn objected to this request and has failed to produce any accounting statements.

During the period when the alleged fraud involving Scorpion shares was in progress, Cohn's annualized return on his initial investment of approximately $2.5 million was $1,134,000 in 1991, $885,000 in 1992, and $3,200,000 in 1993, which amounts to a return of some 181% on Cohn's initial investment during the period in which the fraud is alleged to have taken place.

### Discussion

#### I. The Standard for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure provides that a motion for sum-

mary judgment may be granted when "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The Second Circuit has repeatedly noted that "as a general rule, all ambiguities and inferences to be drawn from the underlying facts should be resolved in favor of the party opposing the motion, and all doubts as to the existence of a genuine issue for trial should be resolved against the moving party." *Brady v. Town of Colchester*, 863 F.2d 205, 210 (2d Cir.1988) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n. 2, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (Brennan, J., dissenting)); *see Tomka v. Seiler Corp.*, 66 F.3d 1295, 1304 (2d Cir.1995); *Burrell v. City Univ.*, 894 F.Supp. 750, 757 (S.D.N.Y.1995). If, when viewing the evidence produced in the light most favorable to the nonmovant, there is no genuine issue of material fact, then the entry of summary judgment is appropriate. *See Burrell*, 894 F.Supp. at 758 (*citing Binder v. Long Island Lighting Co.*, 933 F.2d 187, 191 (2d Cir.1991)).

Materiality is defined by the governing substantive law. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "[T]he mere existence of factual issues—where those issues are not material to the claims before the court—will not suffice to defeat a motion for summary judgment." *Quarles v. General Motors Corp.*, 758 F.2d 839, 840 (2d Cir.1985).

For a dispute to be genuine, there must be more than "metaphysical doubt." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "If the evidence is merely colorable, or is not significantly

probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted).

## II. *The Motion To Strike Will Be Denied*

Dietrich moves to strike the January 4 Letter—which purports to be a photocopy of a letter from Greenfield to Cohn—pursuant to Federal Rule of Evidence 1003. Rule 1003 provides:

> A duplicate is admissible to the same extent as an original unless (1) a genuine question is raised as to the authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original.

Fed.R.Evid. 1003.

■ "Authentication [of a photocopy] requires proving two facts: the original from which the duplicate was copied is itself authentic and, again, the duplicate is an accurate reproduction of that original. . . . [I]f the evidence concerning these facts is sufficient to support a finding of their existence, the item may be admitted and questions concerning the authenticity of the original and the accuracy of the reproduction become matters for the jury to resolve." Charles Alan Wright and Victor Gold, 31 *Federal Practice and Procedure Federal Rules of Evidence* § 1004 (2000).

■ Dietrich has retained a forensic expert who concluded that the January 4 Letter was not in fact created on January 4, 1991.[2] In response, Cohn argues, first, that the date of creation is not an aspect of this exhibit's authenticity, and, second, that based on Cohn's own expert evidence, Dietrich is entitled to have no weight attached to his expert's conclusion.

Contrary to Cohn's contention, the date of the creation of the January 4 Letter is an aspect of its authenticity. *See United States v. Wolfson*, 413 F.2d 804, 806 (2d

---

**2.** Dietrich's submissions are not entirely clear as to whether his challenge is addressed to the date of the creation of the photocopy, the original, or both. Logically, however, the challenge would be addressed to both.

Cir.1969) (discussing expert witness testimony as to authenticity of document exhibit and that it had been prepared on a date other than the one it bore). In addition, the fact that Cohn has an expert whose conclusions contradict those of Dietrich merely demonstrates that there is a dispute of fact as to the authenticity of the document. In addition, Dietrich points out that there are certain inconsistencies between the testimony of Cohn and Greenfield and the January 4 Letter. However, there is sufficient evidence from which a jury could conclude that the document is indeed authentic, and, therefore, it will not be stricken from the record. Rather, the issue of its authenticity will be reserved for trial.

### III. *Cohn Is Not Entitled To Summary Judgment*

Section 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") imposes joint and several liability on any person who "directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder." 15 U.S.C. § 78t(a) (1995).

■ "In order to establish a prima facie case of liability under § 20(a), a plaintiff must show: (1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) that the controlling person was in some meaningful sense a culpable participant in the primary violation." *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir.1998) (internal quotation marks omitted) (*citing SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472–73 (2d Cir.1996)).[3] Once a *prima facie* case has been made out, the

defendant may still escape liability if he shows that he acted in good faith. *First Jersey*, 101 F.3d at 1473 (citations omitted).

Cohn contends that the undisputed evidence demonstrates as a matter of law that Dietrich cannot establish the second and third elements required to make out a *prima facie* case, and, in addition, that he is entitled to summary judgment based on a good faith defense. In addition, Cohn contends that, once the federal law claims are dismissed, this Court should decline to exercise jurisdiction over the pendent state law claims.

### A. *There Is Sufficient Evidence From Which The Jury Could Conclude That Cohn Is A Control Person*

■ "Control over a primary violator may be established by showing that the defendant possessed 'the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract or otherwise.'" *First Jersey*, 101 F.3d at 1472–73 (*quoting* 17 C.F.R. § 240.12b–2). In this Circuit, the "control person" provisions are broadly construed as they "were meant to expand the scope of liability under the securities laws." *Terra Res. I v. Burgin*, 664 F.Supp. 82, 88 (S.D.N.Y.1987) (citations omitted).

■ For purposes of Section 20(a) liability, "actual control requires only the ability to direct the actions of the controlled person, and not the active exercise thereof." *Sanders v. Gardner*, 7 F.Supp.2d 151, 163 (E.D.N.Y.1998) (citations omitted); *see In re Bausch & Lomb, Inc. Sec. Litig.*, 941 F.Supp. 1352, 1368 (W.D.N.Y.1996) (in de-

---

**3.** At one time, it was not clear in this circuit whether scienter or culpable participation was required to make out a prima facie case of control person liability: one line of cases held that all that was required was an allegation of control status, with the burden then shifting to the defendant to establish good faith, while another line of cases held that something more than control status was required. *See Food and Allied Serv. Trades*

*Dep't, AFL–CIO v. Millfeld Trading Co., Inc.*, 841 F.Supp. 1386, 1390 (S.D.N.Y.1994) (discussing cases). However, in *First Jersey*, 101 F.3d 1450, the Second Circuit clarified that in addition to control person status, culpable participation "in some meaningful sense," *id.* at 1472, is an element of the plaintiff's prima facie case, and in *Boguslavsky*, 159 F.3d 715, the Second Circuit reaffirmed this view, *see id.* at 720.

termining control status "courts have given heavy consideration to the power or potential power of influence and control the activities of a person, as opposed to the actual exercise thereof") (internal quotation marks and citation omitted); *Epstein v. Haas Sec. Corp.*, 731 F.Supp. 1166, 1175 n. 5 (S.D.N.Y.1990) (plaintiff need not show that defendants actually exercised practical ability to control violative conduct) (citations omitted). Thus, "control" has been construed as "requiring only some indirect means of discipline or influence short of actual direction" by the controlling person. *Drobbin v. Nicolet Instrument Corp.*, 631 F.Supp. 860, 884 (S.D.N.Y.1986) (internal quotation marks and citation omitted).

■ A sole shareholder of the company that is the primary wrongdoer has been held to be a control person within the meaning of Section 20(a), as ownership strongly suggests that the defendant has the potential power to influence and direct the activities of the wrongdoer. *See Borden, Inc. v. Spoor Behrins Campbell & Young, Inc.*, 735 F.Supp. 587, 590–91 (S.D.N.Y.1990); *Healey v. Chelsea Res. Ltd.*, 736 F.Supp. 488, 494–95 (S.D.N.Y. 1990); *see also Sloane Overseas Fund, Ltd.*, 941 F.Supp. 1369, 1378 (S.D.N.Y. 1996) (control can be inferred from substantial stock ownership).

Cohn was the sole owner of Green–Cohn, owning 100% of its stock and contributing 100% of the equity in the firm. Moreover, Cohn was named as a control person of Green–Cohn on its broker-dealer registration form, Cohn was apparently an incorporating director at the time of his initial equity contribution of approximately $2.6 million, and he never resigned, and Cohn paid Greenfield approximately

$30,000 per month to cover Green–Cohn's operating and overhead expenses. Thus, there is ample evidence from which a jury could conclude that Cohn was a control person of Green–Cohn.

Cohn points to the January 4 Letter as evidence that he abdicated control over Greenfield–Cohn, since the letter states that Greenfield was to have "total control" over the firm and its management. However, as discussed above, there is an issue of fact presented with respect to the authenticity of this letter. Therefore, Cohn is not entitled to summary judgment on this basis.

**B. There Is Sufficient Evidence From Which A Jury Could Conclude That Cohn Was A Culpable Participant**

The third element of a *prima facie* case for control person liability is that the control person have been "in some meaningful sense [a] culpable participant[ ] in the fraud perpetrated by [the] controlled person[ ]." *First Jersey*, 101 F.3d at 1472. The meaning of this element has not yet been addressed at any length by the Second Circuit, other than to state that "a determination of § 20(a) liability requires an individualized determination of a ... defendant's particular culpability." *Boguslavsky*, 159 F.3d at 720.[4] However, there is persuasive authority for the proposition that a willful blindness standard applies, that is, that where the control person "knew or should have known that primary violator, over whom the person had control, was engaged in fraudulent conduct, but ... did not take steps to prevent the primary violation," there is culpability in the sense required by *First Jersey*, 101 F.3d at 1472. *Gabriel Capital,*

4. Indeed, in *First Jersey*, 101 F.3d 1450, despite the court's apparent holding that both controlling person status and that person's culpable participation are part of the prima facie case, the court went on to state that "there can be no question that [the defendant] was a controlling person.... Hence, in order to escape controlling-person liability, [he]

had the burden [to establish good faith]," *id.* at 1473, thus seeming to elide the culpable participation element. However, the *Boguslavsky* court clearly articulated both controlling person status and culpable participation as distinct elements of the prima facie case. *See* 159 F.3d at 720.

L.P. v. Natwest Fin., Inc., No. 99 Civ. 10488, 2000 WL 1538612, at *20, (S.D.N.Y. Oct. 13, 2000) (applying willful blindness standard and discussing development of case law supporting such a standard since First Jersey, 101 F.3d 1450).

Cohn avers that he was merely a passive investor who was not involved in the day-to-day management of Green–Cohn and, therefore, was neither involved in nor had no reason to know of the alleged primary fraud. Dietrich responds that Cohn knew or should have known of the fraud involving the Scorpion stock, and that Cohn participated in that fraud by providing the means to accomplish it.

The evidence supporting Dietrich's position includes the fact that the firm bore his name, the meetings between Cohn and Greenfield, the testimony by Greenfield that Cohn was a director, and the profits received.

In addition, there is the fact that Cohn has failed to produce any of Greenfield's monthly accounting statements. It is well-established that "[w]hen the contents of a document are relevant to an issue in a case, the trier of fact generally may receive the fact of the document's nonproduction or destruction as evidence that the party which has prevented production did so out of the well-founded fear that the contents would harm him." Nation-Wide Check v. Forest Hills Distribs., 692 F.2d 214, 217 (1st Cir.1982). Although Cohn's testimony as to his recollection of the contents of the monthly statements is, to put it mildly, less than crystalline, his testimony in conjunction with Greenfield's establishes the relevance of these statements to

the question of Cohn's notice of Green–Cohn's specific investment activities, which activities included the Scorpion transactions. See Stepak v. Aetna Life and Casualty Co., No. 90 Civ. 00886, 1994 WL 858045, at *19 (D.Conn. Aug. 29, 1994) (party seeking adverse inference must introduce evidence tending to show contents of missing document support inference sought) (citation omitted). In addition, Cohn had notice of the relevance of these documents at the time he failed to produce them. See id.; see also Kronisch v. United States, 150 F.3d 112, 126 (2d Cir.1998) (in case involving destruction of evidence party against whom adverse inference drawn must have had obligation to preserve evidence at time destroyed).[5] Under these circumstances, it would be permissible for the jury to draw an adverse inference against Cohn that he has failed to produce any of these statements out of a fear that they support the contention that he knew or should have known of the Scorpion fraud.[6]

While the evidence is circumstantial, and in some ways rather thin, there is more than a "metaphysical doubt" as to whether Cohn either knew of or was willfully blind to the fraud.[7] Matsushita Elec., 475 U.S. at 586, 106 S.Ct. 1348. Finally, there is no real dispute that Cohn not only "fail[ed] to take steps to prevent the primary violation," but actually provided the financial means by which the fraud was accomplished. Gabriel Capital, 122 F.Supp.2d at 427–429. Therefore, there is sufficient evidence to create a genuine dispute as to Dietrich's prima facie case.

---

5. It may well be that Cohn will successfully rebut the adverse inference at trial. See Transnor (Bermuda) Ltd. v. BP North America Petroleum, 738 F.Supp. 1472, 1484 (S.D.N.Y. 1990) (adverse inference that "the missing evidence is harmful can be rebutted by an adequate explanation of the reason for nonproduction"). On summary judgment, however, the question is whether the jury could permissibly draw an inference against Cohn.

6. Indeed, if the jury concludes that the January 4 Letter was fabricated, that is, that it was not created when it purports to have been, an adverse inference against Cohn would also be permissible on this basis.

7. The thinness of the evidence appears to be not unrelated to Cohn's equivocal deposition testimony, including some rather remarkable lapses in memory. Of course, general attacks on a defendant's credibility are not sufficient to prevent summary judgment.

Dietrich also contends that Cohn, as the sole owner of Green–Cohn, had an affirmative duty to see that Green–Cohn, a brokerage firm, complied with applicable securities regulations, and that Cohn's failure to do so made him a culpable participant in the fraud. Dietrich relies on a line of cases holding that a broker-dealer or the manager of a broker-dealer has affirmative duties of this type in relation to the broker-dealer's employees, as well as certain supervision obligations imposed on broker-dealers by Section 15 of the 1934 Act. *See Marbury Mgmt., Inc. v. Kohn*, 629 F.2d 705, 716 (2d Cir.1980) (broker whose employee has completed fraudulent transactions through broker and generated commission for broker must show it has not been negligent in supervision); *Lanza v. Drexel & Co.*, 479 F.2d 1277, 1301 (2d Cir.1973) (broker-dealer has affirmative duty to exercise "stringent supervision over its salesmen") (citation omitted); *In re Reynolds & Co.*, 39 S.E.C. 902, 1960 WL 3733, at *10 (1960) (holding managing partners liable for employee fraud because "brokers and dealers are under a duty to supervise the actions of employees. . . . [A] contrary rule would encourage ethical irresponsibility by those who should be primarily responsible") (citations omitted); 15 U.S.C. § 78o(b)(4)(E) (requiring brokers to "reasonably . . . supervise" all employees and associated personnel).

Thus, Dietrich analogizes between the relationship of a broker-dealer to its employees, on the one hand, and the relationship of Cohn, as sole owner of Green–Cohn, to Green–Cohn, the broker-dealer entity, on the other hand. Based on this analogy, Dietrich avers that Cohn, as the sole owner of a broker-dealer firm, was a culpable participant unless he shows that he took steps to establish safeguards against the commission of fraud by Green–Cohn. Dietrich relies in particular on *Marbury Mgmt.*, 629 F.2d at 716, in which a broker-dealer was found to have the burden to show it was not negligent in supervising its employees once the plaintiff presented evidence that the employees' fraud was committed through the brokerage firm and the firm benefitted financially, through the receipt of commissions, from these transactions. In a sense, Dietrich seeks to have the burden to establish good faith shifted onto Cohn based on his sole ownership status.

There is a certain logic to Dietrich's argument. It has been said that a failure to impose supervisory obligations on broker-dealers as to their employees would "encourage ethical irresponsibility by those who should be primarily responsible." *Reynolds*, 1960 WL 3733, at *10. Similarly, a failure to impose such obligations on a person who is solely responsible, in financial terms, for a broker-dealer's existence, and indeed who reaps profits from the broker-dealer's fraud, might encourage ethical irresponsibility by this person without whom the fraud would not be possible. However, in addition to the fact that Dietrich's argument for making this analogy is not well-developed, the cases upon which Dietrich relies were all decided before the Second Circuit clarified the elements of a Section 20(a) *prima facie* case in *First Jersey*, 101 F.3d 1450, and *Boguslavsky*, 159 F.3d 715.[8] Moreover, it is not necessary on

---

8. Indeed, based on the current state of the case law in this area, it is not clear whether and to what ways the requirements for a prima facie case are less demanding in cases involving Section 20(a) liability of a broker-dealer rather than other types of control persons (or entities). In *Marbury*, 629 F.2d 705 decided before *First Jersey*, 101 F.3d 1450, the burden shifted to the defendant brokerage firm to establish good faith once it was shown that the employee's fraudulent transactions occurred through the brokerage firm and the firm benefitted financially therefrom, *id.* at 716. In *First Jersey*, 101 F.3d 1450, the burden shifted to the defendant, the founder and head of a brokerage firm, to show he had taken preventive measures once it was shown that he was a control person, *see id.* at 1472–73. However, in *First Jersey* the evidence as to defendant's control person status included evidence of his extensive personal involvement in the firm's operations—and the opin-

.the facts of this case to apply such a rule, because summary judgment is precluded for Cohn for the reasons already discussed.

### C. Cohn Is Not Entitled To Summary Judgment Based On A Good Faith Defense

■ Once the plaintiff has met his burden to establish a *prima facie* case of Section 20(a) liability, the burden shifts to Cohn to establish a defense of good faith. *First Jersey*, 101 F.3d at 1473 (citations omitted); *see* 15 U.S.C. § 78t(a) (defendant must show that he "did not directly or indirectly induce the act or acts constituting the violation"). In order to establish a good faith defense, the burden is on the defendant to "prove that he exercised due care in his supervision of the violator's activities in that he 'maintained and enforced a reasonable and proper system of supervision and internal control[s].' " *First Jersey*, 101 F.3d at 1473 (*quoting Marbury Mgmt.*, 629 F.2d at 716); *Lorenz v. Watson*, 258 F.Supp. 724, 732 (E.D.Pa. 1966) ("[T]o satisfy the requirement of good faith it is necessary for the defendants to show that some precautionary measures were taken to prevent the injury suffered."). "It is not enough on a motion for summary judgment to demonstrate that plaintiffs fall short of producing evidence of culpable conduct; rather, the defendant must put forth [his] own evidence of [the good faith] defense sufficient to direct a conclusion of law that [he] is entitled to the defense." *In re Boesky*, Nos. 732, M21–45–MP, 1995 WL 456368, at *1 (S.D.N.Y. Aug. 1, 1995) (*citing Donohoe v. Consol. Operating & Prod. Corp.*, 982 F.2d 1130, 1139 (7th Cir.1992)).

The record does not indicate any steps by Cohn to prevent the fraud, nor does Cohn point to any. Rather, Cohn contends that he is entitled to summary judgment based on a good faith defense on the theory that he had no notice of any alleged wrongdoing and, therefore, no duty to investigate or control Green–Cohn's activities in Scorpion shares.

As previously discussed, there is sufficient evidence from which a jury could conclude that Cohn knew or should have known of the primary fraud, but was willfully blind to the facts. Thus, he is not entitled to summary judgment on a good faith defense based on the theory that he had no notice. "Willful blindness ... cannot form the basis for a defense of good faith to a charge under § 20(a)." *Boesky*, 1995 WL 456368, at *1; *see Ingenito v. Bermec Corp.*, 441 F.Supp. 525, 533 (S.D.N.Y.1977) ("If the perpetration of the fraud went unnoticed because of willful or reckless disregard, the good faith defense is unavailable.") (*citing Lanza*, 479 F.2d at 1306). If Cohn should have known of the fraud, then he had a duty of due care to take steps to prevent it.

Thus, Cohn is not entitled to summary judgment. In light of this ruling, Cohn's motion to dismiss the pendent state law claims is denied as moot.

### Conclusion

Therefore, for the reasons set forth above, the motion for summary judgment is denied, as is the motion to strike.

It is so ordered.

---

ion is logically read concluding, implicitly, that this evidence was sufficient to establish not only the defendant's control person status but also his culpable participation in the fraud. *Id.* at 1472.