Michael E. WALLACE, Petitioner,

v.

Daljit S. BUTTAR and Paramit Buttar, Respondents.

David Jacaruso and Joseph Scotti, Petitioners,

v.

Daljit S. Buttar and Paramit Buttar, Respondents.

v.

Robert Winston, Additional Respondent.

Nos. 02 Civ. 4297(RWS), 02 Civ. 4286(RWS).

United States District Court, S.D. New York.

Jan. 14, 2003.

As Amended Jan. 21, 2003.

Re, Parser & Partners, New York, NY by Stuart A. Jackson, for Petitioner Wallace.

Zeichner Ellman & Krause, New York, NY by David B. Chenkin, for Buttar Respondents.

Morgan, Padgett & Associates, P.A., Tampa, FL by Stanley T. Padgett, for Buttar Respondents.

Gersten, Savage, Kaplowitz, Wolf & Marcus, LLP, New York, NY by Robert S. Wolf, for Petitioners.

## OPINION

SWEET, District Judge.

Petitioners David Jacaruso ("Jacaruso"), Joseph Scotti ("Scotti") and Michael E. Wallace ("Wallace") (collectively the "Petitioners") have moved in these actions to vacate an arbitration award issued in favor of respondents Daljit S. Buttar and Paramit Buttar (the "Buttars"). The Buttars have cross-moved to confirm the award. For the reasons set forth below, the motion to vacate is granted, and the cross-motion denied.

### Prior Proceedings

These actions by Jacaruso and Scotti (02 Civ. 4286) and Wallace (02 Civ. 4297) were filed on June 7, 2002 and followed in time an action filed by the Buttars in the United States District Court for the Eastern District of North Carolina on June 3, 2002.

The motions to vacate in these actions were filed at the time the actions were commenced, and the Buttars had not accomplished service in the North Carolina action which was then discontinued. The motions·to vacate and the cross-motion of the Buttars to confirm the award were heard and marked fully submitted on September 25, 2002.

### The Arbitration

On September 11, 2000, the Buttars, residents of Raleigh, North Carolina, began an arbitration before the National Association of Securities Dealers, Inc. ("NASD") by filing their original statement of claim against Montrose Capital Management Ltd. ("Montrose"), a brokerage firm, and Robert Winston, one of its brokers.

The arbitration was conducted under the auspices of the NASD before Murray E. Bovarnich, Chairman, G. Lewis Nichols, and Harold G. Koger, arbitrators. The final arbitration hearing was conducted in Raleigh, North Carolina from November 27–30, 2001. On December 7, 2001, a stay of all proceedings against Montrose was entered by the United States Bankruptcy

Court for the Southern District of New York.

The testimony and exhibits in the arbitration concern the losses of $1,192,171.89 suffered by the Buttars as a result of being fraudulently induced to purchase large blocks of stock in CNF Technologies and Skynet Holdings, Inc., two stocks for which Montrose served as the placement agent. At the arbitration hearing, the Buttars limited their claims to the transactions in CNFT and Skynet. Because of that limitation, the facts surrounding the CNFT Bridge Loan and Private Placement and the Skynet Holdings purchases were the central focus of the hearing, and the subject of extended testimony over the four days of hearing. Robert Winston was the broker at Montrose who dealt with the Buttars and made the representations with respect to the securities which they purchased.

Wallace was the president of Montrose and signed Montrose Capital Form BD Amendments under oath, stating that he, Jacaruso and Scotti were control persons of Montrose and that Jacaruso and Scotti were the only directors of Montrose and that Robert Winston had no ownership interest in Montrose. While Wallace was president, Montrose served as the placement agent for Skynet and CNFT.

In the arbitration, Jacaruso and Scotti were characterized as the "investment bankers" for Montrose and brought the CNFT and Skynet transaction to Montrose.

The Private Placement Memorandum ("PPM") for CNFT reveals that it was a "best efforts all or nothing" offering and that once the initial 1,000,000 shares were subscribed to, another 1,000,000 shares could be sold on a "best efforts" basis and for its participation in the offering as placement agent, Montrose would receive $390,000. In addition, the PPM disclosed that Montrose also received warrants and that "[t]he Placement Agent and its principals own 395,000 shares of restricted Common Stock."

Montrose also acted as placement agent for an April 1999 Skynet offering that generated $4,508,000 in gross proceeds, of which Montrose received "sales commissions and non-accountable expenses equal to $586,040" or 13% of the gross proceeds.

Montrose's supervisory functions were vested in John Telfer as chief compliance officer. Wallace, who had an unblemished thirty-year record in the industry, attended one meeting when Winston misrepresented his role at Winston, met the Buttars in passing and did not exercise any supervisory authority. Until the arbitration the Buttars did not know the names of Jacaruso and Scotti.

### The Award

On March 7, 2002, the panel issued its award stating in part as follows:

> After considering the pleadings, testimony and evidence presented at the hearing, and the post-hearing submissions, the Panel decided in full and final resolution of the issues submitted for determination as follows:
>
> 1. The Panel finds Respondent Winston liable for misrepresentation; unauthorized, unsuitable and over-concentrated trading in Skynet and CNFT Technologies; and fraud. The Panel finds Respondents Wallace, Scotti and Jacaruso liable for fraud and also as "Control Persons." See 15 U.S.C. 78t(a); 15 U.S.C. 771; N.C.G.S. 78A-56(a)(2)(c).
>
> 2. Respondents Winston, Wallace, Scotti and Jacaruso are jointly and severally liable and shall pay to Claimants compensatory damages in the amount of $1,064,543.00 plus prejudgment interest from June 1, 2000 through January 30,

2001 in the amount of $127,629.00. Post-judgment interest shall accrue in accordance with Rule 10330(h) of the Code.

3. Respondents Winston, Wallace, Scotti and Jacaruso are jointly and severally liable and shall pay to Claimants punitive damages in the amount of $604,850.00. The Panel finds Respondent Winston liable for punitive damages based upon the Panel's finding of fraud. The Panel finds the control persons, Respondents Wallace, Scotti and Jacaruso, liable for punitive damages based upon the Panel's finding of fraud. *See Hunt v. Miller,* 908 F.2d 1210, 1216 n. 15 (4th Cir.1990). "An employer is liable for an agent's fraud when committed within the scope of the agent's apparent authority, even when the principal did not know or authorize the commission of the fraudulent acts." Also, "a master is liable for punitive damages awarded when the servant or agent causing the injury was acting in the course and scope of the master's business." *See also Black's Law Dictionary,* 6th Ed.1991, p. 455 ff. Post-judgment interest shall accrue in accordance with Rule 10330(h) of the Code.

### The Standard to be Applied to Review of Arbitration Awards

The Federal Arbitration Act sets forth five grounds for vacating an arbitration award: fraudulent procurement, evident partiality by the arbitrators, arbitrators refusing to hear pertinent and material evidence, arbitrators exceeding their powers, or arbitrators imperfectly executing their powers, 9 U.S.C. § 10. However, it is well established that these statutory grounds are not exhaustive. *See, e.g., Wilko v. Swan,* 346 U.S. 427, 436–37, 74 S.Ct. 182, 187–88, 98 L.Ed. 168 (1953) *overruled on other grounds* in *Rodriguez de Quijas v. Shearson/American Express, Inc.,* 490

U.S. 477, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989). The federal courts, including those of the Second Circuit, recognize two additional bases for vacating arbitration awards: manifest disregard of the law and manifest disregard of the facts.

■ Manifest disregard of the law requires more than a mere error in the law or failure on the part of the arbitrators to understand or apply the law, *Siegel v. Titan Indus. Corp.,* 779 F.2d 891, 892 (2d Cir.1985). Manifest disregard of the law occurs when (1) arbitrators knew of a governing legal principle yet refused to apply it or ignored it all together, and (2) the law ignored was well-defined, explicit and clearly applicable to the case. *DiRussa v. Dean Witter Reynolds, Inc.,* 121 F.3d 818, 821 (2d Cir.1997), *cert. denied,* 522 U.S. 1049, 118 S.Ct. 695, 139 L.Ed.2d 639 (1998), of which the arbitrators had knowledge or appreciation of its existence. *Merrill, Lynch, Pierce, Fenner & Smith v. Bobker,* 808 F.2d 930 (2d Cir.1986).

■ Manifest disregard of the facts occurs when an arbitral award runs contrary to "strong" evidence favoring the party bringing the motion to vacate. *Halligan v. Piper Jaffray, Inc.,* 148 F.3d 197, 202, 204 (2d Cir.1998).

In *Willemijn v. Standard Microsystems Corp.,* 103 F.3d 9 (2d Cir.1997), the Court of Appeals for the Second Circuit vacated the order of the district court which had vacated an arbitration award for manifest disregard of the law and remanded the case with directions to confirm the arbitration award, and set forth the following principles to guide an analysis of whether arbitrators manifestly disregarded the law:

The "manifest disregard" test requires "something beyond and different from a mere error in the law or failure on the part of the arbitrators to understand or apply the law." "Manifest dis-

regard of the law may be found ... if the arbitrator 'understood and correctly stated the law but proceeded to ignore it.' "

\* \* \* \* \* \*

■ "The problem is how a court is to be made aware of the erring conduct of the arbitrators." When arbitrators decline to provide an explanation for their decision, a reviewing court can only infer from the facts of the case whether "the arbitrator[s] appreciate[d] the existence of a clearly governing legal principle but decide[d] to ignore or pay no attention to it."

In such a case we must confirm the arbitrators' decision "if a ground for the arbitrator[s'] decision can be inferred from the facts of the case." This is so even if the ground for their decision is based on an error of fact or an error of law.

Conversely, a court may infer that the arbitrators manifestly disregarded the law if it finds that the error made by the arbitrators is so obvious that it would be instantly perceived by the average person qualified to serve as an arbitrator. However, determining whether to make this inference is not an easy task and a reviewing court must proceed with caution. If there is "even a barely colorable justification for the outcome reached," the court must confirm the arbitration award.

*Id.* at 12–13 (citations omitted).

According to the Buttars, *Halligan's* recognition of a "manifest disregard of the evidence" standard is "inconsistent" with the earlier decisions in *Wilko v. Swan,* 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953) and *Willemijn v. Standard Microsystems Corp.,* 103 F.3d 9 (2d Cir.1997).

However, neither *Wilko* nor *Willemijn* contained statements precluding manifest disregard of the evidence as a grounds for review. The court in *Willemijn* did not consider disregard of the evidence as a ground for vacation. Moreover, the Honorable Amalya L. Kearse sat on the bench in both *Willemijn,* decided in January 1997, and *Halligan,* decided in July 1998, and concurred in both decisions, undermining respondents' claims that *Halligan* was inconsistent with *Willemijn.*

Although the particular label "manifest disregard" of the facts or evidence may have found an early use in *Halligan,* the concept of vacating an award due to inconsistency with the evidence existed pre-*Halligan.* In 1981, the Ninth Circuit Court of Appeals, in *American Postal Workers Union AFL–CIO v. U.S. Postal Service,* 682 F.2d 1280 (9th Cir.1982) vacated an award where the arbitrator held that a certain postal worker had not participated in a strike. The Court made undeniably clear that it was the irreconcilability of the arbitrator's decision with the facts that led to vacation:

> In light of the undisputed facts of this case, we could not confirm an award of arbitration simply because the arbitrator stated that Murphy did not strike ... We cannot empower the arbitrator to nullify the mandates of Congress simply by stating that an individual did not strike when, as here, his actions, as presented in undisputed facts, constitute a strike for purposes of the section.... We conclude that Murphy participated in a strike against the Postal Service.... That is the only conclusion which the facts of this case can support. *Id.* at 1285.

In *Pacific Reinsurance Management Corp. v. Ohio Reinsurance Corp.,* 935 F.2d 1019 (9th Cir.1991), the court expressly considered "manifest disregard of the facts" as a possible ground for vacation: "Appellants' arguments display their con-

tinued disagreement with PRMC's figures and with the arbitration panel's tentative acceptance of them for purposes of the IFO. Nevertheless, whatever this court may think of the ultimate weight of PRMC's evidence, appellants do not establish manifest disregard of the facts by the panel sufficient to vacate its order." *Ibid.* at 1026.

### The Imposition of Respondeat Superior Liability is in Manifest Disregard of the Law

■ The award held Wallace jointly and severally liable for punitive damages award on the basis of *Hunt v. Miller,* 908 F.2d 1210, 1216 n. 15 (4th Cir.1990) ("an employer is liable for an agent's fraud when committed within the scope of the agent's apparent authority ...") and *Black's Law Dictionary,* 6th Ed.1991, p. 455 ff. ("a master is liable for punitive damages awarded when the servant or agent causing the injury was acting in the course and scope of the master's business").

■ The defect in this conclusion is that the doctrine of respondeat superior imposes liability on the employer of those committing fraud in their employment. The entity that could have been held liable for Winston's fraud under the doctrine of respondeat superior was Montrose, Winston's employer.

### Imposition of Fraud Liability Manifestly Disregarded the Law

■ In order to commit fraud, one must act with intent to defraud. It is basic that fraud cannot be committed recklessly or negligently; a key requirement is an intention to defraud. *See, e.g., Rowan County Board of Education v. United States Gypsum Co.,* 332 N.C. 1, 17, 418 S.E.2d 648, 659 (N.C.Sup.Ct.1992), *citing Terry v. Terry,* 302 N.C. 77, 83, 273 S.E.2d 674, 677 (N.C.Sup.Ct.1981); *United Re-*

*public Ins. Co. v. Chase Manhattan Bank,* 168 F.Supp.2d 8 (S.D.N.Y.2001), *citing Banque Arabe et Internationale D'Investissement v. Md. National Bank,* 57 F.3d 146, 153 (2d Cir.1995). The Buttars have not challenged this contention.

■ The totality of the evidence reviewed above overwhelmingly indicates that Wallace never dealt with the Buttars, lacked awareness of all wrongdoing in respondents' account, had no duty nor reason to educate himself of the activity in the Buttars' accounts (as others at Montrose performed these supervisory functions), and in any event lacked the actual control and power to do anything even if he became aware of such wrongdoing. Additionally, the Buttars presented no evidence to support a finding that Wallace intended to defraud them, which is unsurprising considering that their statement of claim did not even accuse Wallace of fraud. The Buttars argue that the panel could have found Wallace guilty of fraud because of testimony that Wallace failed to correct Winston when Winston said, before public customers and employees, that he was Montrose's owner. But even if this testimony were true, it has no bearing whatsoever on whether Wallace was guilty of defrauding the Buttars in the sale, purchase and recommendation of stock, since Wallace's alleged "misrepresentation by silence" related only to Montrose's ownership structure. Nor is there any evidence that Wallace's "representation by silence" was made to or in front of the Buttars, or that the Buttars reasonably relied upon this statement to their detriment. There was no evidence of any action taken by Jacaruso and Scotti in connection with the transactions in which Winston defrauded the Buttars.

Clearly the arbitrators could not have found that Wallace, Jacaruso and Scotti

possessed the requisite intention to defraud the Buttars without manifestly disregarding this evidence, or lack of evidence.

### Imposition of Control Liability Manifestly Disregarded the Facts and the Law

 It is undisputed that Winston, a broker employed by Montrose, committed a primary violation of the securities law, that Jacaruso and Scotti were directors and shareholders of Montrose and Wallace was its president. What is at issue is whether or not control liability was established in the record before the arbitrators.

The arbitrators expressly found that the Petitioners were liable as a "control person" under 15 U.S.C. 78t(a) (*i.e.*, section 20 of the Securities Exchange Act of 1934), 15 U.S.C. 77l,[1] and N.C.G.S. 78A–56(a)(2), (c).

Control person liability under 15 U.S.C. 78t(a) extends to every person who, "directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder ... unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." Control person liability under N.C.G.S. 78A–56(a)(2), (c) extends to "every person who directly or indirectly controls a person liable under subsection (a) or (b) ... unless the person who is so liable sustains the burden of proof that he did not know, and in the exercise of reasonable care should not have known, of the existence of the facts by reason of which the liability is alleged to exist."

 The courts and NASD arbitration panels have given full effect to the require-

ment of mental culpability. Control person liability will not lie unless there is, "a primary violation by the controlled person, ... control of the primary violator by the targeted defendant, ... and ... that the controlling person was in some meaningful sense a culpable participant in the fraud." *In re Blech Sec. Litig.*, 961 F.Supp. 569, 586 (S.D.N.Y.1997), quoting *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir.1996). *See also, e.g., Rodriguez v. Baxter Banks & Smith, Ltd.*, NASD Arbitration No. 98–02739 (June 22, 1999) (denying claims for control person liability where claimants had failed to show that respondent had participated in the transaction or in some other culpable conduct); *Mishkin v. Ageloff*, No. 97 Civ. 2690(LAP), 1998 WL 651065, 1998 U.S. Dist. LEXIS 14890 (S.D.N.Y. Sept. 23, 1998) (granting motion to dismiss claim of control person liability since plaintiff failed to come forward with proof that control person defendant acted with a particular state of mind).

 Control person liability therefore requires more than a showing that a person wielded direct or indirect control over the wrongdoer; the control person must additionally possess the necessary mental culpability by either knowing, or failing to know due to their own recklessness or negligence, of the alleged wrongdoing.

The arbitrators, in recognition of this requirement, sustained an objection to testimony of the Buttars' expert witness concerning the general pattern of allegedly deficient supervision at Montrose, on the grounds that such general deficiencies were irrelevant given that control person

---

1. This section is cited by the arbitrators. Most likely the Buttars and the arbitrators intended to cite section 15 of the Securities Act 1933, 15 U.S.C. § 77o. However, the control person liability provisions of section 20 of Securities Exchange Act (15 U.S.C. § 78t) are analogous to section 15 of the

Securities Act (15 U.S.C. § 77o). Both apply the same test for control person liability, *Farley v. Henson*, 11 F.3d 827, 835 (8th Cir. 1993), and although worded differently, the two sections are interpreted the same, *Maher v. Durango Metals*, 144 F.3d 1302 (10th Cir. 1998).

liability depends on a showing of culpability with regard to the specific trades and representations at issue.

No evidence was adduced that the Petitioners were involved in the allegedly unsuitable and unauthorized transactions in the Buttars' accounts, or in the misrepresentations and fraud of Winston. Dr. Buttar stated that his sole contact was with Winston. Dr. Buttar even admitted that he never heard the name of the Petitioners prior to initiating the arbitration, and indeed the only contact between Dr. Buttar and Wallace was one brief handshake.

Although the Petitioners were admitted to be a "control person" of Montrose, no finding of wrongdoing was made against Montrose. Wallace could not be liable as a control person for Montrose's actions. The requirement of control person liability is a violation by the alleged "controlled" person. *Blech Sec. Litig.*, 961 F.Supp. at 586; *First Jersey Sec., Inc.*, 101 F.3d at 1472. The Petitioners on this record could be liable as a control person only for the actions of Winston, and even then only if they were knowing participants in Winston's breaches of the securities laws.

■ *First Jersey Sec., Inc.*, 101 F.3d at 1472–73 (2d Cir.1996) establishes that control over a primary violator may be established by demonstrating that the defendant possessed the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise. However, "actual control over the wrongdoer and the transactions in question is necessary for control person liability." *Cromer Fin., Ltd. v. Berger*, 137 F.Supp.2d 452, 484 (S.D.N.Y.2001). Thus, the power to direct the management and policies of a person must be a real, *de facto* power and not just *de jure:* "[O]fficer or director status alone does not constitute control." *Ibid. See also Blech Sec. Litig.*,

961 F.Supp. at 586 (S.D.N.Y.1997) (control person liability claim dismissed because the clearing broker's ability to affect and influence the introducing broker's actions did not amount to actual control) *citing Ross v. Bolton*, 1989 WL 80428, 1989 U.S.Dist. LEXIS 7704 (S.D.N.Y.1989) (defendant must possess actual control over the transactions in question). The Buttars have cited *Dietrich v. Bauer*, 126 F.Supp.2d 759 (S.D.N.Y.2001) for the proposition that control requires only the ability to direct the actions of the controlled person, and not the active exercise thereof, and that indirect discipline or influence, short of actual direction, will suffice. *Dietrich* does not, however, alter the rule that an alleged control person must actually possess, in fact rather than theory, the ability to direct the actions of the controlled person.

Here the task of supervising the operations of Montrose's retail brokerage arm was specifically placed in the hands of the chief compliance officer, John Telfer, not Wallace, who reviewed on a daily basis all correspondence and every single trading ticket. Wallace was not even part of Montrose's executive committee. Respondents' own witness, Michael Kavanagh, a witness for the Buttars, ultimately described Wallace as "closer in power to the janitor than the President." The Buttars rely solely on Wallace's status as President and Jacaruso and Scotti's designation as a control person of Montrose.

■ Under federal law, *i.e.*, section 20 of the Securities Act 1934 (15 U.S.C. § 78t(a) or section 15 of the Securities Act 1933 (15 U.S.C. § 77o)), mental culpability will not lie if the controlling person, "acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." *In re Indep. Energy Holdings PLC Sec. Litig.*, 154 F.Supp.2d 741 (S.D.N.Y.2001), the

court stated "to satisfy the state of mind portion of the culpable participation element, plaintiffs may plead either conscious misbehavior or recklessness." Thus, the level of mental culpability required for control person liability under federal law is intention or recklessness; the control person must have participated in the action with knowledge that the securities laws were being violated, or with reckless indifference as to whether a violation occurred.

## Conclusion

The motions to vacate the Award are granted, the cross-motion to confirm it is denied.

It is so ordered.