J-A11021-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| JOHN C. MALEY, ANNELIESE MALEY & JOHN J. MALEY | : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellants | : : : : | |
| v. | : : : | |
| | : | No. 874 MDA 2017 |
| SHELL WESTERN EXPLORATION AND PRODUCTION, LP (SWEPI, LP); EAST RESOURCES, INC., AND GRADY AUSTIN | : : : : : | |

Appeal from the Judgment Entered May 4, 2017
In the Court of Common Pleas of Tioga County Civil Division at No(s):
352-CV-2012

BEFORE: STABILE, J., NICHOLS, J., and PLATT, J.[*]

MEMORANDUM BY NICHOLS, J.:                          **FILED DECEMBER 18, 2018**

Appellants John C. Maley, Anneliese Maley, and John J. Maley (collectively, Maleys), appeal from the judgment entered in favor of Appellees Shell Western Exploration and Production, LP, and East Resources, Inc. (collectively, Shell), and against defendant Grady Austin. The Maleys raise several issues regarding the authentication and admission of photocopied documents purporting to grant Shell rights to oil and gas from the Maleys' property, jury instructions, and an alleged request to have the trial court strike the deed at issue. We affirm.

_____

[*] Retired Senior Judge assigned to the Superior Court.

We state the facts and procedural history as presented by the trial court:

John J. and John C. Maley (father and son) are the owners of property consisting of approximately eighty acres in Wellsboro, Tioga County, Pennsylvania.  John J. Maley's wife Virginia Lee Maley was also a co-owner of the property prior to her passing during the pendency of this case and her interest transferred to John J. Maley.  John C. Maley resides on the property with his wife Anneliese Maley and their children, as he did in 2005 when he was approached by Grady Austin regarding the possibility of entering into an oil and gas lease with East Resources, Inc.  Mr. Austin was an independent landman working through Long Consulting Group, LLC [(Long)] which had been retained by East Resources, Inc. to obtain oil and gas leases in the Tioga County area.  At first [John C.] Maley was reticent to enter into the gas lease but, after numerous meetings with Mr. Austin, [John C.] Maley and his parents ultimately did sign the gas lease along with a memorandum of lease [*i.e.*, the "Shell" document[1]].  John J. and Virginia Maley never met with Mr. Austin and received all their information directly from their son prior to signing the lease and the memorandum.  Shell Western Exploration and Production, LP (SWEPI) ultimately purchased the Maley[s'] lease, along with thousands of others, and are the current possessors of the lease.  During the course of the litigation SWEPI became aware, and notified all other parties and the court, they were not in possession of the original lease and the document they believed to be the original lease was actually a copy.[2]  They continue to be unable to produce the original lease signed by the Maleys.

_____

[1] The Shell document actually consists of two separate documents: an oil and gas lease and a memorandum of lease.  Consistent with the record, we refer to them as a singular document.  We also refer to the memorandum of lease as a "lease" in disposing of the Maleys' fourth issue.

[2] The parties do not dispute that the Shell document is a photocopy.  N.T. Pre-trial Hr'g, 10/7/16, at 29.  Indeed, both parties acknowledged as such during their respective opening arguments.  R.R. at 297a, 298a (citing to the reproduced record for the parties' convenience).  As discussed below, the central issue in this case is whether the photocopy is an accurate copy of the purported lease that the Maleys dispute signing.

The Maleys claim the lease they signed called for the lease to end after five years if East Resources, Inc. had not established a well producing gas on their property and they were not receiving free gas. They assert there was nothing in the lease allowing for pooling or unitization.[3] John C. Maley contends Grady Austin promised him the lease included these provisions and he would have neither signed the lease nor advised his parents to do the same if it did not. When John C. Maley received notice from East Resources, Inc. they planned to unitize his property and therefore triggered the automatic renewal clause of the lease he began contacting East Resources, Inc. employees to complain that his lease did not contain such a provision. John C. Maley was ultimately provided with a copy of his lease but does not believe that it is the document he signed. After SWEPI purchased the Maleys' lease John C. Maley continued to insist the lease they had was not the document he signed. [John C.] Maley continues to insist he did not sign either the lease produced by SWEPI or the Memorandum of Lease recorded in the Tioga County Recorder of Deeds' office in the Tioga County Courthouse. Both documents were notarized by the notary, Dale Tillinghast, who admits he notarized both documents without ever meeting any of the Maleys or personally observing them sign the documents. Mr. Tillinghast notarized the documents at a Long Consulting Group office at the request of Grady Austin.

John C. Maley, John J. Maley, Virginia Lee Maley, and Anneliese Maley initiated the current litigation by filing a complaint in federal court in the Middle District of Pennsylvania. The case was ultimately removed back to state court and the Tioga County Court

---

[3] "Unitization refers to the consolidation of mineral or leasehold interests in oil or gas covering a common source of supply." ***Amoco Prod. Co. v. Heimann***, 904 F.2d 1405, 1410 (10th Cir. 1990) (footnote and citations omitted). "While frequently used interchangeably, the terms 'pooling' and 'unitization' refer to separate procedures. Pooling involves the combination of several small tracts of land to meet the spacing requirements for a single well. Unitization refers to field-wide or partial field-wide operation of a producing reservoir involving multiple adjoining land tracts." ***Id.*** at n.3 (citations omitted). Generally, the "unitization clause of an oil and gas lease grants the lessee the power to unitize the lessors interest without further consent by the lessor." ***Id.*** at 1411 (citations and footnote omitted).

of Common Pleas where the Maleys filed a multi-count complaint[4] against [SWEPI], Shell Energy Holding GP, LLC, Shell U.S. E&P Investments, LLC, Shell Exploration and Production Company, Shell Oil Company, East Resources, Inc., Jane and John Doe of East Resources in his/her individual and official capacity . . . , Long Consulting Group, LLC, Jane and John Doe of Long Consulting Group, LLC, Grady Austin, in his individual and official capacity, and Dale Til[l]inghast, in his individual and official capacity.[5]

Trial Ct. Op. at 1-3.

During discovery, the court issued a scheduling order instructing the parties to exchange expert reports by June 30, 2015, among other things. Shell produced an initial report by its expert, Khody R. Detwiler, and served a supplemental report on or about August 17, 2015. The Maleys, however, elected not to serve interrogatories on Shell regarding any proposed expert testimony.

Prior to trial, the Maleys sought to exclude the Shell document and Shell's expert testimony addressing whether the Maleys wrote the signatures reproduced in the Shell document. On June 24, 2016, the trial court permitted such testimony but precluded Detwiler from testifying as to whether the Shell document was an authentic copy of the lease. R.R. at 323a (Order, 6/24/16

---

[4] The Maleys raised claims of fraud, fraud in the inducement, negligent misrepresentation, interference with prospective contractual relations, loss of consortium, breach of contract, and that the lease was void as a matter of law, among others.

[5] Long Consulting Group, LLC, Jane and John Doe of Long Consulting Group, LLC, Grady Austin, and Dale Tillinghast (collectively "Long"), are not parties to this appeal.

("[The Maleys'] motion requesting the exclusion of the testimony of [Shell's] expert witness is hereby DENIED as to testimony regarding the authenticity of the signatures on the document and hereby GRANTED as to whether or not the copy is an authentic copy of the original lease.")). The court also denied the motion to the extent the Maleys sought to exclude "any claim, assertion or opinion testimony" regarding the Shell document. R.R. at 185a; *see also* R.R. at 233a (Order, 6/24/16 ("[The Maleys'] motion seeking the exclusion of testimony regarding the so called 'Shell Document' is hereby DENIED.")).

At a subsequent pretrial hearing, the trial court explained its June 24th order as preventing Detwiler from testifying that the Shell document "is a true and correct copy of the lease" signed by the Maleys. N.T. Pre-trial Hr'g, 10/7/16, at 26. The trial court stated that Detwiler could still testify that the Shell document "appears consistent with copies of other leases." *Id.* at 27.[6]

The trial court summarized the remainder of the procedural history as follows:

> Trial was conducted October 18, 2016[,] through October 25, 2016. After the close of [the Maleys'] case all participating [d]efendants moved for [non-suit, which the trial court granted in part and denied in part]. Claims went to the jury against [Shell], Long Consulting Group, LLC, and Grady Austin. The jury returned a verdict in John C. Maley's favor as to Defendant Grady Austin in the amount of $80,000.00 for negligent misrepresentation and . . . against [the Maleys] as to all other counts. [The Maleys] and [SWEPI] filed post-trial motions.

---

[6] We discuss Detwiler's expert reports and testimony in further detail, *infra*.

Trial Ct. Op. at 3-4. The trial court denied all post-trial motions and entered judgment on the verdict.

The Maleys timely appealed from the judgment and filed a court-ordered Pa.R.A.P. 1925(b) statement. The trial court filed a responsive Pa.R.A.P. 1925(a) opinion.[7]

The Maleys raise four issues:

1. Did the trial court abuse its discretion and err as a matter of law in denying [the Maleys'] Motion *in Limine* and admitting the "Shell document" without requiring Shell to produce the original or authenticate the document as an accurate copy of the original lease the Maleys agreed to and signed?

2. Did the trial court abuse its discretion and err as a matter of law in denying [the Maleys'] Motion *in Limine* to preclude [Shell's] expert testimony, report and exhibits?

3. Did the trial court err as a matter of law in instructing the jury on the "Uniform Photographic Copies of Business and Public Records as Evidence Act"?

4. Did the trial court err as a matter of law in failing to direct the Recorder of Deeds to remove the fraudulently notarized Memorandum of Lease?

Maleys' Brief at 4 (issues reordered to facilitate disposition).

---

[7] On June 7, 2017, the trial court ordered the Maleys to comply with Pa.R.A.P. 1925(b) on or before Wednesday, June 28, 2017. The trial court docketed the Maleys' Rule 1925(b) statement on Thursday, June 29, 2017. Although the filing appears untimely on its face, the record includes the Maleys' official United States Postal Service Priority Mail envelope, which reflects a mailing date of June 27, 2017. *See* Pa.R.A.P. 1925(b)(1).

Before addressing the Maleys' arguments, we note our standard of review of an order denying a motion for a new trial is whether the trial court "committed an error of law or an abuse of discretion." ***Joseph v. Scranton Times L.P.***, 129 A.3d 404, 432 (Pa. 2015) (citation omitted); ***see also Braun v. Wal-Mart Stores, Inc.***, 24 A.3d 875, 891-92 (Pa. Super. 2011) (*per curiam*) (citation omitted).[8]

## I. Evidentiary Issues Regarding the Shell Document

By way of background, on June 30, 2015, Detwiler prepared his initial expert report. The report discussed his findings after comparing the Maleys' signatures on the Shell document and their verified, authentic signatures on other documents. R.R. at 69a. His report explicitly presumed that the copy he reviewed was a true and accurate reproduction of the original. ***Id.*** at 71a.

_____

[8] The Court has defined abuse of discretion as follows:

> An abuse of discretion may not be found simply because an appellate court might have reached a different conclusion than the trial court; rather, to constitute an abuse of discretion, the trial court ruling must be the product of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous. Consequently, when reviewing the trial court's exercise of discretion, it is improper for an appellate court to step into the shoes of the trial judge and review the evidence *de novo*. As we consistently have emphasized in our jurisprudence, where the record does not reflect an abuse of discretion by the trial court, the Superior Court may not disturb a trial court's discretionary ruling by substituting its own judgment for that of the trial court.

***Polett v. Pub. Comm'cns, Inc.***, 126 A.3d 895, 924 (Pa. 2015) (quotation marks, brackets, and citations omitted).

Detwiler essentially opined that the Maleys wrote the signatures reproduced in the Shell document. *Id.* at 71a-72a.

Detwiler further concluded that there was no evidence that the Maleys' signatures were fraudulently placed on the Shell document. *Id.* at 72a.

> It should be further noted that I found no evidence to substantiate or support the position that the signatures . . . were produced onto the [Shell document] through some type of transposition method (i.e. a "Cut-and-Paste" fabrication - either manually or digitally). If the signatures would have been the product of a "Cut-and-Paste" fabrication one would normally expect to find indicia of the fabrication process such as copying artifacts (i.e "trash marks") or alignment/misalignment issues. In addition, the signatures that appear on the [Shell] document are not [identical to each other]; as such, there would have to have been multiple signature models employed to complete a "Cut-and-Paste" fabrication . . . . However, the only way to confirm this position would be to conduct a thorough and complete forensic examination of the original [Shell document].

*Id.* at 72a. In other words, the alleged forger would have needed at least two different original signatures by the same author. *Id.*

On August 17, 2015, Detwiler prepared a supplemental report, which noted that he was provided with several original oil and gas leases for unrelated parties. R.R. at 123a. Detwiler was asked to determine whether the layout and format of the Shell document was consistent with the layout and format of the other original leases. *Id.* at 125a. He concluded that the Shell document was consistent with those unrelated original leases. *Id.* at 126a.

Detwiler testified about the foregoing at trial, *see, e.g.*, R.R. at 651a, 684a-85a, 704a, 712a, and Shell moved the Shell document into evidence

without objection. *Id.* at 653a. Copies of the pertinent exhibits were also published to the jury, and they could compare the signatures.

On appeal, the Maleys contend that Shell failed to establish that the Shell document complied with all of the elements set forth in Pa.R.E. 803(6), the hearsay exception for records of a regularly conducted activity. Specifically, the Maleys argue that they presented "sufficient evidence to raise a genuine issue of fact regarding the authenticity and trustworthiness of the 'Shell document.'" Maleys' Brief at 33. The Maleys note that the Shell document (1) is a photocopy, (2) printed on paper sized differently than the lease the Maleys actually signed, (3) contains notarized signatures contrary to their undisputed testimony they did not sign before a notary, and (4) does not contain handwritten notations, unlike the documents the Maleys claimed they actually signed. *Id.* at 33-34. Additionally, the Maleys contend that the photocopy lacks "information about the original from which it was copied," and point out that Shell never produced the original document. *Id.* at 33-35. The Maleys separately fault the trial court for not requiring Shell to authenticate the document under Pa.R.E. 902(11), and for accepting the representation of Shell's counsel that the document was authentic. *Id.* at 39.

Shell counters that the testimony of Detwiler, its document expert, established the Shell document's authenticity. Shell's Brief at 21-22. Shell contends that the Shell document is not excluded as hearsay under Pa.R.E. 803(15), as it is a document affecting a property interest. *Id.* at 22-23.

Regardless, even if it was subject to Rule 803, Shell argues that the Shell document was not admitted for the truth asserted therein, but as rebuttal evidence to refute the Maleys' testimony denying their signing of the document. *Id.* at 23-24.[9]

In reply, the Maleys contend that Rule 803(15) does not apply because it is limited to statements within the document and not the document itself. Maleys' Reply Brief at 13.[10] In their view, Rule 803(15) "does not exempt the underlying document from satisfying admissibility requirements." *Id.* at 13-14.

We review a trial court's evidentiary ruling for an abuse of discretion. *Brady v. Urbas*, 111 A.3d 1155, 1161 (Pa. 2015). "To the degree the issue of whether the law has been misapplied involves a purely legal question, it is reviewed *de novo.*" *Id.* (citations omitted). We may also affirm on any basis. *Mariner Chestnut Partners, L.P. v. Lenfest*, 152 A.3d 265, 277 (Pa. Super. 2016).

The Pennsylvania Rules of Evidence closely follow the Federal Rules of Evidence. Pa.R.E. 101 cmt. Accordingly, we may rely on federal caselaw

---

[9] Shell also noted that the Shell document had to be admitted in order for the Maleys to succeed on their claims for fraud, fraudulent inducement, and negligent misrepresentation. The Maleys did not address this apparent incongruity.

[10] We note that in support, the Maleys reference and purport to quote comments to Rule 803(15). *See* Maleys' Reply Brief at 13. Those comments, however, are not in Rule 803(15).

- 10 -

construing the Federal Rules of Evidence to the extent they do not contradict the Pennsylvania Rules of Evidence. *See NASDAQ OMX PHLX, Inc. v. PennMont Secs.*, 52 A.3d 296, 303 (Pa. Super. 2012). We may similarly be guided by the decisions of other states' courts "to the degree we find them useful and not incompatible with Pennsylvania law." *Eckman v. Erie Ins. Exch.*, 21 A.3d 1203, 1207 (Pa. Super. 2011) (citation omitted). Additionally, we may rely on cases predating the enactment of the Pennsylvania Rules of Evidence to the extent they are not contrary. *Commonwealth v. Aikens*, 990 A.2d 1181, 1185 n.2 (Pa. Super. 2010).

### A. Hearsay

Pennsylvania Rule of Evidence 801 follows:

**(a) Statement.** "Statement" means a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion.

**(b) Declarant.** "Declarant" means the person who made the statement.

**(c) Hearsay.** "Hearsay" means a statement that

    (1) the declarant does not make while testifying at the current trial or hearing; and

    (2) a party offers in evidence to prove the truth of the matter asserted in the statement.

Pa.R.E. 801. Thus, "hearsay" is "a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion," made by that person out of court and offered into "evidence to prove the truth of the matter asserted in the statement." Pa.R.E. 801(a), (c).

> There are many situations in which evidence of a statement is offered for a purpose other than to prove the truth of the matter asserted.
>
> Sometimes a statement has direct legal significance, whether or not it is true. For example, one or more statements may constitute an offer, an acceptance, a promise, a guarantee, a notice, a representation, a misrepresentation, defamation, perjury, compliance with a contractual or statutory obligation, etc.

Pa.R.E. 801 cmt.[11]

_____

[11] The note to Federal Rule of Evidence 801(c) similarly states that if "the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay." Fed. R. Evid. 801(c) note (citation omitted). As the comment and note states, a written contract has independent legal significance, regardless of the veracity of any assertions or statements within the contract. **See** Fed. R. Evid. 801(c) note; Pa.R.E. 801 cmt. In **United States v. Iverson**, 818 F.3d 1015 (10th Cir. 2016), the United States Court of Appeals for the Tenth Circuit, reasoned as follows:

> The issue is whether evidence that the statement was made is in itself relevant to a material issue in the case. For example, the statement may be the predicate for a defamation claim; if so, the statement is not being offered for its truth (it is actionable because it is *false*) and is not hearsay. Or a promise to do something may be offered into evidence to prove the existence of a contract even if the promisor was insincere in making the promise. The promise is not offered into evidence to prove the "truth" of the promisor's statement. The promise itself has independent legal significance, so there is no hearsay issue. In both circumstances, the evidence of the statement is not being used to prove the truth of some assertion but "merely to show that it was actually made."

**Id.** at 1020 (citations omitted); **Kepner-Tregoe, Inc. v. Leadership Software, Inc.**, 12 F.3d 527, 540 (5th Cir. 1994) (holding a contract "has legal reality independent of the truth of any statement contained in it. Under the objective theory of contracts, the fact that two parties signed a contract is enough to create legal rights, whatever the signatories might have been thinking when they signed it. The admission of a contract to prove the

operative fact of that contract's existence thus cannot be the subject of a valid hearsay objection." (footnote omitted)).  For example, in **Consol. Rail Corp. v. Thomas**, 463 N.E. 2d 315 (Ind. Ct. App. 1984), the Court held the trial court did not err by admitting a photocopied contract over a hearsay objection because it was offered for "its independent legal significance" and therefore was not hearsay.  **Id.** at 320 (citation omitted); **accord, e.g.**, **Stuart v. UNUM Life Ins. Co. of Am.**, 217 F.3d 1145, 1154 (9th Cir. 2000) (holding district court erred by concluding contract was inadmissible hearsay because "it is a legally operative document that defines the rights and liabilities of the parties in this case." (citation omitted)); **Mueller v. Abdnor**, 972 F.2d 931, 937 (8th Cir. 1992) (holding that a contract is not hearsay, particularly "evidence of lost profits based on a contract . . . because such evidence concerns the existence of the contractual terms rather than an assertion of their 'truth.'" (citation omitted)); **United States v. Rubier**, 651 F.2d 628, 630 (9th Cir. 1981) ("Facts of independent legal significance constituting a contract which is at issue are not hearsay." (citation omitted)); **Padilla v. United States**, 58 Fed. Cl. 585, 593 (Fed. Cl. 2003) (holding that when "the evidence offered has legal significance independent of the truth of any statement contained in it, it is not hearsay." (citations omitted)); **Brooks v. Firestone Polymers, LLC**, 70 F. Supp. 3d 816, 825 n.2 (E.D. Tex. 2014) (holding that a "contract, however, is not hearsay because it has independent legal significance." (citation omitted)); **Crompton Greaves, Ltd. v. Shippers Stevedoring Co.**, 776 F. Supp. 2d 375, 386 (S.D. Tex. 2011) (same); **State v. Villena**, 400 P.3d 571, 579 (Haw. 2017) (construing identical Hawaii Rule of Evidence 802 and holding licensing letter was not hearsay); **Island Directory Co. v. Iva's Kinimaka Enters., Inc.**, 859 P.2d 935, 939 (Haw. Ct. App. 1993) (holding that it "is well-settled that in a suit for breach of contract, the contract allegedly breached is not hearsay and is thus admissible into evidence." (citations omitted)); **Deep Keel, LLC v. Atl. Private Equity Grp.**, 773 S.E.2d 607, 613 (S.C. Ct. App. 2015) (holding that because the "loan documents were offered to establish the existence of a contract and the terms of that contract," they were not hearsay under substantially similar South Carolina Rule of Evidence 801); **McKelvey v. Hamilton**, 211 P.3d 390, 396 (Utah Ct. App. 2009) (interpreting identical Utah Rule of Evidence 801 and rejecting argument that letter accepting offer was "inadmissible hearsay because proof of the existence of a contract is based entirely upon the letter's truth," because letter was non-hearsay act of contract); **Bank of Am. NA v. Neis**, 835 N.W.2d 527, 541 (Wis. Ct. App. 2013) (citing numerous legal authorities for the proposition of "a consensus rule that contracts . . . are not hearsay when they are offered only for their legal effect, not 'to prove the truth of the matter asserted'" in construing similar Wisconsin equivalent to

A contract may be admitted to establish a claim of fraud, ***see generally Rempel v. Nationwide Life Ins. Co., Inc.***, 370 A.2d 366, 372 (Pa. 1977), which requires proof of the following:

> (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance.

***Gibbs v. Ernst***, 647 A.2d 882, 889 (Pa. 1994) (footnote omitted).

A contract may also be evidence of fraud in the inducement, which "claims that the representations were fraudulently made and that 'but for them' he would never have entered into the agreement." ***Blumenstock v. Gibson***, 811 A.2d 1029, 1036 (Pa. Super. 2002); ***see generally Rempel***, 370 A.2d at 372. Similarly, a contract could establish a claim for negligent misrepresentation, which requires establishing the following: "(1) a misrepresentation of a material fact; (2) made under circumstances in which the misrepresenter ought to have known its falsity; (3) with an intent to induce another to act on it; and (4) which results in injury to a party acting in

---

Rule 801); ***see also Hydrite Chem. Co. v. Calumet Lubricants Co.***, 47 F.3d 887, 892 (7th Cir. 1995) (stating, "it is direct evidence, not hearsay, when a party to a dispute over a contract testifies to the offer or the acceptance made by the other contracting party."); ***see generally*** David F. Binder, Hearsay Handbook § 2:6 (4th ed. 2017) (citing cases for proposition that a "written contract has independent legal significance").

- 14 -

justifiable reliance on the misrepresentation." ***Bilt-Rite Contractors, Inc. v. The Architectural Studio***, 866 A.2d 270, 277 (Pa. 2005) (citation omitted).

Here, the Shell document was not subject to the hearsay rule. The Shell document is a lease that in and of itself has direct, independent legal significance, regardless of any statements within the lease. ***See*** Pa.R.E. 801 cmt.; ***see, e.g.***, ***Iverson***, 818 F.3d at 1020; ***Kepner-Tregoe***, 12 F.3d at 540. Contrary to the Maleys' protestations, Shell did not have to comply with Pa.R.E. 803(6) or 803(15). Moreover, admission of the Shell document would have assisted proving the Maleys' claims for fraud, fraud in the inducement, and negligent misrepresentation. ***See Bilt-Rite Contractors***, 866 A.2d at 277; ***Blumenstock***, 811 A.2d at 1036; ***Gibbs***, 647 A.2d at 889; ***see generally Rempel***, 370 A.2d at 372. For these reasons, the trial court did not abuse its discretion in permitting the introduction of the Shell document, although we affirm on different reasoning. ***See Brady***, 111 A.3d at 1161; ***Mariner Chestnut Partners***, 152 A.3d at 277.

### B. Authentication

The Maleys also challenge the authenticity of the Shell document, albeit in the context of a hearsay exception for business records. We address their arguments to the extent they can be construed as a general challenge to the Shell document's authenticity.

Pennsylvania Rule of Evidence 901 addresses authentication:

**(a) In General.** To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce

- 15 -

evidence sufficient to support a finding that the item is what the proponent claims it is.

Pa.R.E. 901(a).[12]

Pennsylvania Rule of Evidence 901(b) lists several examples of evidence fulfilling section 901(a), including 901(b)(3): "*Comparison by an Expert Witness or the Trier of Fact.* A comparison with an authenticated specimen by an expert witness or the trier of fact." Pa.R.E. 901(b)(3). The comment to Rule 901(b)(3) provides as follows:

> . . . When there is a question as to the authenticity of an exhibit, the trier of fact will have to resolve the issue. This may be done by comparing the exhibit to authenticated specimens. Under this rule, the court must decide whether the specimen used for comparison to the exhibit is authentic. If the court determines that there is sufficient evidence to support a finding that the specimen is authentic, the trier of fact is then permitted to compare the exhibit to the authenticated specimen. Under Pennsylvania law, lay or expert testimony is admissible to assist the jury in resolving the question. **See, e.g.**, 42 Pa.C.S. § 6111.

---

[12] In **Crompton Greaves**, the district court explained as follows:

> Because a contract is not hearsay, to be admissible it need only be authenticated. The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims. The standard for authenticating evidence is low and may be satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

**Crompton Greaves**, 776 F. Supp. 2d at 386 (citations and quotation marks omitted).

Pa.R.E. 901 cmt. (some citations omitted).[13]

A statute also governs the admissibility of expert opinion evidence regarding handwriting. 42 Pa.C.S. § 6111.

> **(b) Comparison of handwriting.—**It shall be competent for experts in giving their testimony, under the provisions of this section, to make comparison of documents and comparison of disputed handwriting with any documents or writing admitted to be genuine, or proven to the satisfaction of the judge to be genuine, and the evidence of such experts respecting the same shall be submitted to the jury as evidence of the genuineness or otherwise of the writing in dispute.
>
> **(c) Comparison of signatures.—**It shall be competent for experts in formulating their opinions to the court and jury to place the genuine and disputed signatures or writing in juxtaposition, and to draw the attention of the jury thereto; and it shall furthermore be competent for counsel to require of an expert a statement of the principles on which he has based his work, the details of his work, and his opinion that the results are important to the point at issue, or the reasoning, analysis and investigation by which he has arrived at his opinion.
>
> **(d) Jury question.—**The opinions of the witnesses to handwriting being submitted as competent testimony to the jury, the final determination as to whether any particular handwriting is genuine or simulated shall remain, as heretofore, a question for the jury on all the evidence submitted.

42 Pa.C.S. § 6111(b)-(d).

_____

[13] Pennsylvania Rule of Evidence 902(11), upon which the Maleys rely, states that a document is self-authenticating if it fulfills the requirements of Pa.R.E. 803(6), which sets forth a hearsay exception for records of a regularly conducted business activity. **See** Pa.R.E. 902(11); **see also** Pa.R.E. 803(6). We note that self-authentication is not the only method of authentication.

Initially, no party disputes that the Shell document is a photocopy.[14] The Maleys asserted they did not actually sign the original lease from which the copy was purportedly made, *i.e.*, the Shell document. In contrast, Detwiler opined both in his expert reports and at trial that assuming the Shell document was an accurate reproduction, the Maleys actually signed the original lease. *See, e.g.*, R.R. at 71a-72a, 651a. Detwiler compared the undisputed authentic signatures of the Maleys with the signatures on the Shell document. *See, e.g.*, R.R. at 651a. More critically, Detwiler testified that the layout and format of the Shell document is comparable to the layout and format of authentic leases. *See, e.g.*, R.R. at 126a, 684a-85a.

Given the low threshold for authentication evidence, *see Crompton Greaves*, 776 F. Supp. 2d at 386, the trial court properly permitted the evidence to be considered by the jury. *See Brady*, 111 A.3d at 1161. The jury was aware of the parties' respective positions regarding the Shell document and the Maleys' signatures.[15] The Shell document was admitted into evidence without objection and published to the jury for their evaluation. R.R. at 653a. It was left to the jury to make the ultimate determination as to the genuineness of the Maleys' signatures and the Shell document. *See* 42

---

[14] There was a brief discussion as to whether the Shell document is a first or subsequent-generation copy, *i.e.*, a copy of a copy.

[15] Because we conclude the Shell document was not hearsay, we need not address the Maleys' contention of error under Pa.R.E. 902(11).

Pa.C.S. § 6111(d); Pa.R.E. 901 cmt. Accordingly, we perceive no abuse of discretion by the trial court in letting the Shell document go to the jury.

### C. The Best Evidence Rule

The Maleys raise a third argument in support of their issue that the trial court impermissibly admitted the Shell document. They posit that Shell was required to produce the original document under Pa.R.E. 1002. Maleys' Brief at 40. No statute, the Maleys insist, exempted Shell from producing the original lease. *Id.* In the Maleys' view, they presented sufficient evidence that the Shell document should have been precluded under Pa.R.E. 1003. *Id.* at 42. Such evidence, according to the Maleys, included their testimony that the Shell document was not the lease they signed, *id.* at 43, and evidence that the Shell document could have been altered without detection. *Id.* at 46. The Maleys similarly argue that Shell failed to provide sufficient secondary evidence that the photocopy was an accurate duplicate of the original. *Id.* at 48.

Pennsylvania Rule of Evidence 1002 states that an "original writing, recording, or photograph is required in order to prove its content unless these rules, other rules prescribed by the Supreme Court, or a statute provides otherwise." Pa.R.E. 1002. The comment to Rule 1002 provides as follows:

> This rule corresponds to the common law "best evidence rule." The rationale for the rule was not expressed in Pennsylvania cases, but commentators have mentioned four reasons justifying the rule.

(1) The exact words of many documents, especially operative or dispositive documents, such as deeds, wills or contracts, are so important in determining a party's rights accruing under those documents.

(2) Secondary evidence of the contents of documents, whether copies or testimony, is susceptible to inaccuracy.

(3) The rule inhibits fraud because it allows the parties to examine the original documents to detect alterations and erroneous testimony about the contents of the document.

(4) The appearance of the original may furnish information as to its authenticity.

Pa.R.E. 1002 cmt. (citations omitted).[16]

Pennsylvania Rule of Evidence 1004 states as follows, in relevant part:

An original is not required and other evidence of the content of a writing, recording, or photograph is admissible if:

(a) all the originals are lost or destroyed, and not by the proponent acting in bad faith;

Pa.R.E. 1004. The comment notes that "[w]hen the proponent of the evidence alleges that it is lost, there should be evidence that a sufficient search was made." *Id.* cmt. (citation omitted).

Pennsylvania Rule of Evidence 1008 discusses the role of the jury when one or more of the following issues are raised:

_____

[16] Pennsylvania Rule of Evidence 1003 provides that a "duplicate is admissible to the same extent as the original unless a genuine question is raised about the original's authenticity or the circumstances make it unfair to admit the duplicate." Pa.R.E. 1003.

> Ordinarily, the court determines whether the proponent has fulfilled the factual conditions for admitting other evidence of the content of a writing, recording, or photograph under Rule 1004 or 1005.[17]  But in a jury trial, the jury determines—in accordance with Rule 104(b)[18]—any issue about whether:
>
> (a) an asserted writing, recording, or photograph ever existed;
>
> (b) another one produced at the trial or hearing is the original; or
>
> (c) other evidence of content accurately reflects the content.

Pa.R.E. 1008.

One treatise noted the following with respect to the interaction between

Rules 1002, 1003, and 1004.

> Pa.R.E. 1002 requires the party seeking to prove the content of a writing, recording or photograph to offer the original of the writing, recording or photograph.  In some cases production of the original is excused.  For example, under Pa.R.E. 1003 a duplicate is admissible to the same extent as the original.  Pa.R.E. 1004 and 1005 are exceptions to Pa.R.E. 1002.  Under these rules production of the original is excused and the contents of a writing, recording or photograph may be proven by other evidence provided that the requirements of these Rules are met.  Ordinarily this is a preliminary question to be decided by the court under Pa.R.E. 104.  But under Pa.R.E. 1008, in a jury trial, the jury determines—in accordance with Rule 104(b)—any issue about whether (a) the writing, recording or photograph ever existed; (b) the one produced at trial is the original; or (c) other evidence of content accurately reflects the content.  This means that the court should make a preliminary determination of whether the

---

[17] Pennsylvania Rule of Evidence 1005 discusses copies of public records.  **See** Pa.R.E. 1005.  No party has argued the rule applies here.

[18] Pennsylvania Rule of Evidence 104(b) follows: "**(b) Relevance That Depends on a Fact.**  When the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist. The court may admit the proposed evidence on the condition that the proof be introduced later."  Pa.R.E. 104(b).

proponent has offered sufficient evidence to support a finding of the facts required by Pa.R.E. 1004 or 1005.  If not, the evidence is excluded.  If the court finds that the evidence is sufficient to support a finding of the facts required by Pa.R.E. 1004 or 1005, the evidence is admitted and the jury decides whether the writing, recording or photograph ever existed, the one produced at trial is the original, or the evidence of content accurately reflects the content of the original.

Leonard Packel & Anne Bowen Poulin, 1 West's Pa. Practice, Evidence § 1008-1 (4th ed. 2013).

The importance of the jury's role in resolving authenticity was addressed in **United States v. Hatfield**, 685 F. Supp. 2d 318 (E.D.N.Y. 2010).  In **Hatfield**, a criminal case, the government wished to bar the defendant from introducing a duplicate copy of a purportedly fraudulent original document, citing Fed.R.Evid. 1003.[19]  **Hatfield**, 685 F. Supp. 2d at 319-20 (summarizing the government's position that because the original was fraudulent, the defendant should be barred from introducing a copy at trial).  The district court disagreed, reasoning that because the government had expressly "den[ied] that an authentic original [document] ever existed," the copy must be admitted.  **Id.** at 320.[20]

_____

[19] "A duplicate is admissible to the same extent as the original unless a genuine question is raised about the original's authenticity or the circumstances make it unfair to admit the duplicate."  Fed.R.Evid. 1003.

[20] The **Hatfield** court reasoned as follows:

Under Federal Rule of Evidence 1008(a), "when an issue is raised" regarding "whether the asserted writing ever existed," the "issue

- 22 -

Here, we agree with the discussion of the interaction of the Article X

evidentiary rules set forth in 1 West's Pa. Practice, Evidence § 1008-1, as well

as the rationale of the courts that have addressed this precise evidentiary

issue: given the Maleys' position that the Shell document was fabricated, the

question of whether the Shell document was an authentic copy was a fact

---

is for the trier of fact to determine."  This is because "it is often true that these questions determine outcome" and "few would doubt that the jury should decide whether a written [document] existed for purposes of deciding the case on the merits." Christopher B. Mueller and Laird C. Kirkpatrick, 5 FED. EVID. § 10:40 (3d ed.). Consequently, the jury, and not the Court, must determine whether the [document at issue] is genuine. And, accordingly, [the defendant] must be permitted to introduce both a copy of the [document], and any evidence he has supporting the [document's] legitimacy. ***See Hill v. City of Houston***, 235 F.3d 1339 (Table), 2000 WL 1672663, *7 (5th Cir. 2000) (unpublished) (given Rule 1008, "the question of whether exhibit eight is a fake or rather, authentic copy was a fact question which was properly submitted to the jury"); ***Tinley v. Poly–Triplex Technologies, Inc.***, 07–CV–1136, 2009 WL 812150, *7 (D. Colo. Mar. 26, 2009) (permitting copy of agreement to be admitted into evidence, despite genuine questions concerning whether an original ever existed, because "evidence suggesting that the Tinley Agreement never existed, as well as the credibility of the parties' testimony regarding the existence of the Tinley Agreement are questions for the jury to decide under Rule 1008"). The Government may, of course, attack the legitimacy of the [document], and the credibility of any evidence [the defendant] uses to try to substantiate it.  But "these questions go to the weight, rather than the admissibility of the evidence."  ***Tinley***, 2009 WL 812150 at *7.

***Hatfield***, 685 F. Supp. 2d at 320; ***see Dietrich v. Bauer***, 126 F. Supp. 2d 759, 764 (S.D.N.Y. 2001) (holding that conflicting expert witness testimony regarding authenticity of exhibit established a "dispute of fact as to the authenticity of the document," which was properly left for the jury).

question properly left for the jury. *See, e.g.*, *Hatfield*, 685 F. Supp. 2d at 320; *Dietrich*, 126 F. Supp. 2d at 764. Shell could not produce the original lease. The parties have not referred this Court to any evidence of record of bad faith. *See* Pa.R.E. 1004(a). Thus, without evidence of bad faith, the mere fact that Shell (or one of its corporate predecessors who had possessed the original) lost or destroyed the original lease at issue is insufficient to bar Shell from attempting to introduce a photocopy, subject to applicable legal authorities.

In the case before us, Shell provided expert witness testimony on the authenticity of the Maleys' signatures and the format and layout of the Shell document, as compared to other authentic leases. Such expert testimony conflicted with the Maleys' testimony that they did not sign the original lease. Thus, it was for the jury to weigh the credibility of the conflicting testimony. *See, e.g.*, *Hatfield*, 685 F. Supp. 2d at 320; *Dietrich*, 126 F. Supp. 2d at 764. But that determination is necessarily a question of weight and not admissibility. *See Hatfield*, 685 F. Supp. 2d at 320. Accordingly, we discern no abuse of discretion with the trial court's decision to admit the Shell document and not exclude it under the best evidence rule, as well as permit the jury to resolve the question of fact. *See* Pa.R.E. 1008; *Brady*, 111 A.3d at 1161; *see, e.g. Hatfield*, 685 F. Supp. 2d at 320; *Dietrich*, 126 F. Supp. 2d at 764; R.R. at 651a, 684a-85a; Leonard Packel & Anne Bowen Poulin, 1 West's Pa. Practice, Evidence § 1008-1 (4th ed. 2013).

## II. Preclusion of the Testimony of Shell's Expert Testimony

Initially, we reiterate that the Maleys did not serve interrogatories on Shell regarding any proposed expert testimony. Shell produced Detwiler's reports and he testified at trial regarding his conclusions. We quote from the disputed trial testimony, which was during Shell's direct examination of Detwiler:

[Shell's counsel]: Now, did you do anything else to determine whether there may have been any alterations to the questioned documents?

[Detwiler]: One of the other things we did -- the rest of this chart goes through more illustrations like this, but one of the other things, in particular with the oil and gas lease, was when you examined the document from the reverse side, more specifically the signature page, some things copied through on the document that I looked at. Again, the document that I examined at Attorney Mercer's office was a color photocopy. But when you examine the reverse side of the signature page, you can actually see that the bleed-through[21] bled through and it was copied over into the document that I examined. And I do have a brief illustration, which will help you understand that, but the other thing that copied through was also the notarial stamp; so, this is consistent

_____

[21] Detwiler defined bleed-through as follows:

Bleed-through is more of a generic term that we would use in the field; but bleed-through occurs when you write on the surface of a page. The best example I can give you is my five-year-old using a Sharpie on a coffee table. When you write through and you turn the page over you can see where it bled through and you're just hoping that it didn't get on something. So, that is what bleed-through is, in a generic sense. And when I examined this document, even though it was a photocopy, the photocopier picked up the presence of what appears to be bleed-through on the reverse side of the signature page.

R.R. at 693a.

with the document that I examined being a photocopy of a document that contained original writing with respect to the signatures, and the notarial stamp and the notarial act itself where the names were written in.  But, again, like I said, I have an illustration that will help you understand this...

N.T. Detwiler, 10/21/16, at 62.  The Maleys did not object.

Shell subsequently asked Detwiler to discuss an addendum he had prepared—specifically, a document comparison chart—to Detwiler's supplemental report.  The addendum purports to be a pristine and marked-up copies of the signature page of the lease at issue, as reproduced below:





In response to a query by the Maleys' counsel, Shell's counsel stated the above addendum was prepared "earlier this month," N.T. Detwiler, 10/21/16, at 67, *i.e.*, a few weeks before trial began.[22]  The Maleys objected as follows:

> [Maleys' counsel]: I would object it's not timely.  The deadline for the expert reports was a certain time and clearly, I mean, asking questions about this, and I object to the additional information. The expert reports should be the four corners of what was produced in June and August 2015.
>
> The court: Do you want to respond [Shell's counsel]?

---

[22] Detwiler later testified it was prepared sometime in the week before trial. N.T. Detwiler, 10/21/16, at 82.  Shell should have, but did not, file an amended or supplemental pretrial memorandum referencing this exhibit, given its use during Detwiler's direct examination.

[Shell's counsel]: Your Honor, it, it is – it's not going beyond the scope of the expert report. It is additional explanation to the Jury to support the conclusion of the supplemental report.

The court: I'll allow it.

N.T. Detwiler, 10/21/16, at 68.

Detwiler then testified that bleed-through on the photocopy was evidence that the Maleys' signatures were not fraudulently placed on the original source of the photocopy:

[Shell's counsel]: Well, before we get into an analysis of of [sic] that bleed-through, what does the presence of bleed-through tell you?

[Detwiler]: The presence of bleed-through, even on a photocopy, tells you that, even though you can't say it's a true and accurate reproduction of the original, you can certainly say that the document itself that was copied, it copied a document that contained original writing at some point in time. So, that's what the bleed-through tells you is that there was original writing on whatever it was that was copied.

Q: Now, can you explain for the Jury that bleed-through that you were talking about using [the addendum]?

A: Sure. If you look at the very first page; what I've done here is just a reproduction on the left-hand side of the signature page. I just -- more or less the bottom half, it's not the entire page, on the left-hand side. On the right-hand side is actually an image of the reverse of that signature page. And then if you turn to page two; again, on the left-hand side is a reproduction of the reverse side, and I've highlighted three boxes in gray and I've enlarged them off to the right. And I've placed a bunch of small red arrows that show, on this document, which would actually be toner, but it was a reproduction of what appears to be consistent with bleed-through based on where the document demonstrated these characteristics. Again, surrounding the signatures, surrounding the texts and the notarial act, where their names were written out; and then, again, with the actual notary stamp on the bottom,

where it was stamped through and you can see it coming through.
. . .

* * *

Q: Now, what -- how does this support a conclusion that the signature block wasn't somehow cut out of one document and and [sic] pasted on to the memorandum of lease?

A: Sure. If the memorandum of lease would have been a a [sic] cut and paste fabrication and these signatures were cut out of something else, they would have been cut out in original format, because we do have bleed-through coming through, so you can see that. If the signatures were cut out in original format from the original document then pasted together, because it's a color photocopy, that's a very good quality, the document that I examined, you would certainly be able to see either tape marks or Wite-Out or anything else where those marks would be. So, again, this just provides further evidence that I could find no evidence to support the proposition that the documents could have been a cut and paste.

*Id.* at 69-72. The Maleys did not object to the addendum's admission as Shell's exhibit nine. *Id.* at 78; **see also** R.R. at 877a-79a (Shell's exhibit nine).

Subsequently, on cross-examination, Detwiler testified that he found no evidence that the Shell document was not a true and accurate reproduction of the original lease at issue, but he could not confirm that without examining the lost original:

[Maleys' counsel]: And your assumption that those photocopies were a true and accurate reproduction of the original document, that's what your report is clarifying; isn't that correct?

[Detwiler]: No, I could find no evidence that they weren't. But, again, without access to the original there's no way to confirm that, which is what it says on the following page [of his initial expert report]. Page 4 [of] 7: However, the only way to confirm

- 29 -

> this position would be to conduct a thorough and complete forensic examination of the original [Shell] document[].

N.T. Detwiler, 10/21/16, at 83. Detwiler also reiterated that he was comparing signatures, *id.* at 84, could only testify that the signatures were written on a document, *id.* at 85, and found no evidence that the signatures were artificially placed. *Id.* at 86.

On appeal, the Maleys raise several arguments regarding the trial court's decision to permit Detwiler to testify based on the original and supplemental reports. Maleys' Brief at 63. In the Maleys' view, the original report was prejudicial and confusing for two reasons. First, the Maleys argue the report presumed that the Shell document was an accurate reproduction of the original. *Id.* at 64. Second, the report, according to the Maleys, was substantially limited to evaluating the signature page. *Id.* at 65-66. Thus, in the Maleys' view, the report "was unfairly prejudicial and confusing to the jury to permit Detwiler to give testimony on the 'Shell document' without first establishing it was a relevant and authentic copy of the original lease the Maleys' signed." *Id.* at 66.

The Maleys similarly assail the foundations of Detwiler's supplemental report. Specifically, the Maleys claim that because the report merely compared the margins and spacing of the Shell document against other comparable leases, an expert report was unnecessary. *Id.* at 66-67.

In addition, the Maleys argue that the trial court erred by permitting Detwiler to testify beyond the fair scope of both of his reports. *Id.* at 69

(citing Pa.R.C.P. 4003.5(c)). Specifically, the Maleys allege that during his testimony, Detwiler used a demonstrative exhibit and testified about "bleed-through", which the Maleys claim was not discussed in Detwiler's reports. *Id.* at 73-74. The Maleys therefore conclude they were prejudiced by unfair surprise.

Shell counters by initially arguing that Detwiler's testimony assisted the jury because it pertained directly to the Maleys' claim that their signatures were improperly placed on the lease at issue. Shell's Brief at 47. In any event, Shell contends that Detwiler's testimony did not violate the fair scope requirement of Pa.R.C.P. 4003.5(c), because the rule does not apply. Shell explains that in their view, Rule 4003.5(c)'s fair scope restriction "applies only when an expert's report has been developed" via interrogatories or court-ordered discovery. *Id.* at 48. Because the Maleys did not pursue either option, Shell argues Rule 4003.5(c) does not apply. *Id.* at 49.

But even presuming Rule 4003.5(c) applied, Shell continues, Detwiler's bleed-through testimony fell within the scope of his supplemental report. *Id.* at 51. Shell argues that Detwiler was retained to identify any evidence that the Maleys' signatures were fabricated. *Id.* at 52. Detwiler's testimony regarding the bleed-through, Shell concludes, falls within that scope. *Id.* at 53-54.

The standard of review is whether the trial court abused its discretion by permitting the expert testimony. *See Brady*, 111 A.3d at 1161; *accord Rost v. Ford Motor Co.*, 151 A.3d 1032, 1042 (Pa. 2016).

Pennsylvania Rule of Evidence 702 addresses expert testimony:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge is beyond that possessed by the average layperson;

(b) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; and

(c) the expert's methodology is generally accepted in the relevant field.

Pa.R.E. 702. "An opinion is not objectionable just because it embraces an ultimate issue." Pa.R.E. 704. A "trial court may exclude expert opinion testimony if the probative value of the testimony is outweighed by the potential to cause confusion or prejudice."[23] *Green v. Pa. Hosp.*, 123 A.3d

---

[23] One treatise explains:

Prejudice, of course does not mean detrimental to a party's case but rather an undue tendency to suggest decision on an improper basis. Exclusion is based on the concern that the evidence would cause the jury to base its decision on something other than the legal propositions relevant to the case or would divert the jury's attention away from their duty of weighing the evidence impartially. Evidence may be admitted despite its prejudicial character if its probative value and importance to the case warrant it.

310, 325 (Pa. 2015) (citations omitted); *see* Pa.R.E. 403. This Court has also held that "the trial court will not be reversed in ruling upon the admissibility of testimony to the ultimate issue in the case unless the trial court clearly abused its discretion and actual prejudice occurred." ***Childers v. Power Line Equip. Rentals, Inc.***, 681 A.2d 201, 210 (Pa. Super. 1996) (internal brackets and citation omitted).

Pennsylvania Rule of Civil Procedure 4003.5 addresses discovery of expert testimony:

> **Rule 4003.5. Discovery of Expert Testimony. Trial Preparation Material**
>
> (a) Discovery of facts known and opinions held by an expert, otherwise discoverable under the provisions of Rule 4003.1 and acquired or developed in anticipation of litigation or for trial, may be obtained as follows:
>
> > (1) A party may through interrogatories require
> >
> > > (A) any other party to identify each person whom the other party expects to call as an expert witness at trial and to state the subject matter on which the expert is expected to testify and
> > >
> > > (B) subject to the provisions of subdivision (a)(4),[24] the other party to have each expert so identified state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion. The party answering the interrogatories

---

Leonard Packel & Anne Bowen Poulin, 1 West's Pa. Practice, Evidence § 403-1 (4th ed. 2013) (internal quotation marks and footnotes omitted).

[24] This subdivision pertains to privileged communications not pertinent here. ***See*** Pa.R.C.P. 4003.5(a)(4).

may file as his or her answer a report of the expert or have the interrogatories answered by the expert. The answer or separate report shall be signed by the expert.

\*     \*     \*

(c) To the extent that the facts known or opinions held by an expert have been developed in discovery proceedings under subdivision (a)(1) or (2)[25] of this rule, the direct testimony of the expert at the trial may not be inconsistent with or go beyond the fair scope of his or her testimony in the discovery proceedings as set forth in the deposition, answer to an interrogatory, separate report, or supplement thereto. **However, the expert shall not be prevented from testifying as to facts or opinions on matters on which the expert has not been interrogated in the discovery proceedings.**

Pa.R.C.P. 4003.5(a), (c) (emphasis added).[26] "The purpose of [Pa.R.C.P. 4300.5(a)(1)(B)] is to avoid unfair surprise by enabling the adversary to prepare a response to the expert testimony." **Woodard v. Chatterjee**, 827 A.2d 433, 441 (Pa. Super. 2003) (citation omitted).

The purpose of Pa.R.C.P. 4003.5(c) "is to prevent incomplete or fudging of reports which would fail to reveal fully the facts and opinions of the expert or his grounds therefor. In other words, the fair scope rule favors the liberal

---

[25] This subdivision provides that "[u]pon cause shown, the court may order further discovery by other means, subject to such restrictions as to scope and such provisions concerning fees and expenses as the court may deem appropriate." Pa.R.C.P. 4003.5(a)(2).

[26] As the comment to the rule states, counsel "may be well advised to conduct his discovery broadly, by paraphrasing the language of 4003.5(a), which will require the expert to state all his opinions and grounds, thus preventing surprise testimony at trial concerning grounds never raised during the discovery." Pa.R.C.P. 4003.5(a) cmt.

discovery of expert witnesses and disfavors unfair and prejudicial surprise."

***Id.*** (brackets, internal quotation marks, and citations omitted).  The comment

to Rule 4003.5(c) provides:

> Where the full scope of the expert's testimony is presented in the answer to interrogatories or the separate report, as provided in subdivisions (a)(1) and (2), this will fix the permissible limits of his testimony at the trial.  But, if the inquirer limits his inquiry to one or more specific issues only, the expert is free to testify at trial as to any other relevant issues not included in the discovery. **Therefore, what happens at the trial may depend upon the manner in which the expert is interrogated**.  The inquirer may be well advised to conduct his discovery broadly, by paraphrasing the language of 4003.5(a), which will require the expert to state all his opinions and grounds, thus preventing surprise testimony at trial concerning grounds never raised during the discovery.

Pa.R.C.P. 4003.5 cmt. (emphasis added).

In ***Barrick v. Holy Spirit Hosp. of the Sisters of Christian Charity***,

32 A.3d 800, 810 (Pa. Super. 2011) (*en banc*), this Court explained the strict

scope of non-party expert interrogatories:

> Our Supreme Court has interpreted how Pa.R.C.P. 4003.5 interacts with the general scope of discovery, announcing that Pa.R.C.P. 4003.5 should be read to restrict the scope of **all** discovery from non-party witnesses retained as experts in trial preparation.  Thus, according to our Supreme Court, any request for discovery not covered under Pa.R.C.P. 4003.5(a)(1) **shall** be channeled through the Rule's cause shown criterion.
>
> Under Pa.R.C.P. 4003.5(a)(1), the rule allows a party to submit interrogatories **to any other party**, requiring the opposition to identify each of their expert witnesses as well as "to have each expert so identified state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion." Pa.R.C.P. 4003.5(a)(1). . . .  We also underscore that Pa.R.C.P. 4003.5(a)(1) narrowly defines the substantive inquiries that a party may require an opposing expert

to answer in an interrogatory. As this section of the rule specifies, a party may only require opposing experts to state the facts and opinions to which they are expected to testify and to summarize the grounds for each such opinion. Any other interrogatory, aside from these two specific inquiries, exceeds the scope of the plain language contained within Pa.R.C.P. 4003.5(a)(1). Consequently, as indicated by our Supreme Court's construction of Pa.R.C.P. 4003.5, to obtain further discovery regarding the testimony of an expert witness by means other than this narrowly defined set of interrogatories, a party must show cause and acquire a court order for the additional discovery.

*Barrick*, 32 A.3d at 809-10 (emphases in original and internal quotation marks and citations omitted).

Initially, the Maleys' argument, at heart, is that Detwiler should have been precluded from testifying because the reports forming the basis of his expert conclusions were purportedly prejudicial and confusing. All parties, the trial court, and the jury were well aware that one of the issues was whether the Maleys' signatures were fraudulently placed on the Shell document. Detwiler's reports, which formed the basis of his expert testimony, addressed the former. *See* Pa.R.E. 704. Indeed, as we discussed above, 42 Pa.C.S. § 6111 permitted Detwiler's expert testimony on handwriting. *See* 42 Pa.C.S. § 6111. Based on the foregoing, we decline to hold that the trial court abused its discretion by holding that the Maleys' allegations of undue prejudice would have caused the jury to base its decision on an improper basis. *See Childers*, 681 A.2d at 210.

Further, we decline to address whether Detwiler's bleed-through testimony fell within the fair scope of either of his reports. We do so because

the Maleys failed to propound any interrogatories appropriately directed to Shell's experts, such as Detwiler. *See* Pa.R.C.P. 4003.5 & cmt. Absent court order, interrogatories are the only means to discover the facts and opinions of an expert's testimony. *See Barrick*, 32 A.3d at 809-10. Thus, the Maleys' decision to not send expert interrogatories meant Detwiler was not precluded from testifying about bleed-through—a matter "on which the expert has not been interrogated in the discovery proceeding." *See* Pa.R.C.P. 4003.5(c). Further, to the extent the Maleys challenge the addendum, they failed to object to its admission. N.T. Detwiler, 10/21/16, at 78. For these reasons, no relief is due.

### III. Instructing the Jury on the Uniform Photograph Copies of Business and Public Records as Evidence Act, 42 Pa.C.S. § 6109

The Maleys next claim that the trial court erred in issuing a jury instruction based on Section 6109. Shell responds that the Maleys waived this issue because they failed to contemporaneously object when the instruction was given, but regardless, the claim lacks merit.

*A. Waiver of Jury Charge Issue*

"Whether [a party] waived their challenge to the jury instruction presents a question of law for which our standard of review is *de novo*; our scope of review is plenary." *Passarello v. Grumbine*, 87 A.3d 285, 291 n.4 (Pa. 2014) (citations omitted). "Our courts have made clear that an appellant must make a timely and specific objection to a jury instruction to preserve for review a claim that the jury charge was legally or factually flawed." *Braun*,

24 A.3d at 968 (citation omitted); *see generally* Pa.R.C.P. 227. As the Pennsylvania Supreme Court noted:

> It has long been the law in this Commonwealth that in order to preserve for appellate review an issue concerning the correctness of a trial court's charge to the jury, the complaining party must submit a specific point for charge or make a timely, specific objection to the charge as given.

*Broxie v. Household Fin. Co.*, 372 A.2d 741, 743 (Pa. 1977).

In *Shinal v. Toms*, 162 A.3d 429 (Pa. 2017) (plurality), the plaintiffs filed a brief in opposition to the defendant's proposed jury charge. *Id.* at 451 n.26. The court overruled the objection. *Id.* Following a defense verdict, the plaintiffs "again raised the issue in a timely post-trial motion." *Id.* A majority of the *Shinal* Court held that by "lodging a specific objection to the proposed charge, and challenging the charge in their post-trial motion, the [plaintiffs] preserved their objection." *Id.* Furthermore, according to the *Shinal* Court, at the hearing on the plaintiffs' post-trial motion, the trial court addressed the jury charge issue, considered the issue preserved, and held it lacked merit. *Id.* (citing *Jones v. Montefiore Hosp.*, 431 A.2d 920, 923 n.5 (Pa. 1981), in support of the proposition that "[a]lthough no specific objection was made at trial to the charge given, appellants' exception to the trial court's refusal to charge as requested . . . was sufficient to put that charge before us for appellate review."); *accord Jones v. Ott*, 191 A.3d 782, 791 n.13 (Pa. 2018) (plurality) (majority of Court agrees jury charge issue preserved when party

files proposed jury instructions, obtains trial court ruling, and raises issue in a post-trial motion).

Here, similar to the plaintiffs in **Shinal**, the Maleys objected to the instruction at issue at the charging conference. N.T. Trial Anneliese Maley, 10/18/16, at 81 ("I strongly oppose any ruling or any instruction that says Pennsylvania says a copy's acceptable"), 85; **see also id.** at 90. Although the Maleys did not explicitly object when the court actually issued the disputed instruction or before the jury began its deliberations, identical to the plaintiffs in **Shinal**, the Maleys also filed a post-trial motion reiterating their challenge to the jury instruction. **See Shinal**, 162 A.3d at 451 n.26; R.R. at 907a-08a; **accord Jones**, 191 A.3d at 791 n.13. Identical to the trial court in **Shinal**, the instant trial court addressed it on the merits in its Rule 1925(a) decision. **See id.** Moreover, Shell has not referred this Court to any binding legal authority requiring counsel to not only object at the charging conference, but also object "contemporaneously," *i.e.*, at the time "the instruction is given to the jury." Shell's Brief at 40. For these reasons, we decline to find waiver.

*B. Merits of Jury Charge Issue*

Before summarizing the Maleys' arguments, we reproduce the following exchange from the parties' charging conference:

> [Maleys' counsel]: Your Honor, I'm wondering if you could explain to me how putting a charge about Pennsylvania Law says a copy's acceptable, when the issue in this case is that the Plaintiffs are saying the copy that you produced is not the document I signed. You're sending the message that the copy is something that can

be used to enforce an agreement that these people say they never entered. So, I'm, I'm really --

The court: -- well, the law does allow that. If, if this Jury determines -- they're going to determine credibility, they're going to determine who they believe, they're going to determine whether the Maleys were fraudulently induced to enter into this --

[Maleys' counsel]: -- okay --

The court: -- what is purported to be this lease?

[Maleys' counsel]: Yes.

The court: All right?

[Maleys' counsel]: So, how does the instruction that says Pennsylvania allows copies going to assist in that? Or because –

The court: -- I'll tell you what, if you can assure me you're not going to argue to the Jury that the absence of the copy supports the fraud, then I don't have to advise the Jury of the law.

[Maleys' counsel]: I don't understand.  The, the absence of the copy?

The court: If you're not -- if you're telling me you're not going to argue -- essentially, [Shell's counsel], I assume, is making a preemptive argument that you're going to argue, to the Ladies and Gentleman of the Jury, that because [Shell] doesn't have the original document, they should find in favor of your client.

[Maleys' counsel]: Right.

The court: That does not fairly represent the law.  That, in fact, leaves the Jury without the appropriate law and invites them to make a decision that is directly counter to the law in Pennsylvania.

[Maleys' counsel]: Wait a second, I don't - I, I -- I am not following how instructing the Jury that says, the law in Pennsylvania says a copy is okay – my clients are saying the copy that has been produced is not the copy they signed.  It's not the document they signed.  It's not a copy that belongs to their efforts and their ways.

- 40 -

To say that a copy is okay implies that the copy is something my client signed. If the Jury's role is to decide whether or not my clients prevailed or not --

The court: -- which it is --

[Maleys' counsel]: -- stating that Pennsylvania Law does not require an original; is that what -- can you read it out to me, because I think --

The court: -- it is based -- it's based on the statute.

[Maley's counsel]: The Business Record Statute?

The court: It's based on the statute of Title 42 § 6109(b): "Pennsylvania Law allows a company to make a photocopy of a document and use that photocopy to the same extent as it would use the original. A company that has made such a photocopy is not required to keep the original document. Moreover, the photocopy is as admissible in evidence as the original itself."

[Maley's counsel]: Except, Your Honor --

The court: -- now, that's not been admitted,[27] so I won't give the last part of that.

[Maleys' counsel]: But, Your Honor, the issue with that is there's nothing in there about authenticity. When a company destroys the original, they got some kind of record of authenticity, something that shows that the document that they've got is authentic. So, you know, that's talking about invoices and, you know, large volumes of things where there's not a lot of question about the terms. This particular document is term sensitive. Every single word matters. And to imply that a copy is the same as, or can replace the original, as if the original can be destroyed -- basically saying: well, [Shell's corporate designee] testified to that that's an appropriate business practice. I find that -- it causes me a huge amount of concern, Your Honor.

---

[27] We presume the court misspoke or was referencing the original lease because the Shell document was admitted into evidence. *See* Maleys' Trial Ex. 4; Shell's Trial Ex. 5.

- 41 -

The court: And I understand that, but, honestly, that's not the question before the -- that's a question for the legislature. That's not a question for this Court, nor a question for the Jury.

[Maleys' counsel]: I think that the instruction that you're about to give will give the wrong impression, because it sounds like it doesn't matter -- if a company keeps the original document, it's okay to just show up with something that's in their file, so that someone in Mr. Maley's position can never ever succeed, because the company just has to have the original. I mean, excuse me --

[The court]: -- that's not true, he can, he can -- your clients can prevail, if you can convince the Jury that, in fact, the fraud that you've alleged occurred. . . . -- the fraud that you've alleged is that the lease -- is that this, the document they purport to be the lease is not the lease.

[Maley's counsel]: Right.

[The court]: All right?

[Maleys' counsel]: Right.

[The court]: You're entitled to present whatever evidence you can, but you're not entitled to argue to the Jury: because they don't have the original, you should find that they have defrauded my clients and then hoodwink the Jury, or prevent the Jury from acquiring – or expect me to prevent the Jury from having the knowledge that, in fact, there is a statute that provides, that permits companies to do this.

R.R. at 748a-52a.

Subsequently, the trial court reiterated that it was going to prevent the Maleys from arguing that because Shell was unable to provide the original "wet ink" document, the jury could presume a fraud occurred. *Id.* at 754a. ("I will not couch the situation of arguing to the Jury that: because we didn't get the lease -- because you can't see the wet ink lease, you can just, Ladies

and Gentleman, go down there and presume that a fraud occurred. That, that's your burden. You've got to prove that."). Maleys' counsel responded as follows:

> [Maleys' counsel]: Your Honor, what about the fact that there's no, nothing in these instructions that requires there to be any authenticity involved with the business record? In other words, will you include something that at least says the business records need to be authentic first before they're copied and destroyed?
>
> The court: What do you mean authentic?
>
> [Maleys' counsel]: I mean original documents that are connected to the action and the person they purport to be connected to. Once a business has a way to establish authenticity, I can see making, you know, doing a copy and having their chain of, your chain of custody, or something like that, that shows what they did. That would make sense. But to just do an -- you know, like, you don't have to have a -- a copy works -- it leaves a whole piece out where my clients are really prejudiced by that instruction.
>
> The court: Okay.
>
> [Maleys' counsel]: So, I would like there to be something about the authenticity of these, Your Honor.
>
> The court: All right. I appreciate your remarks. I will consider them as we, as we go through this.

*Id.* at 755a.

Following the conference, the parties gave their closing arguments. The Maleys argued that the Shell document is a photocopy and emphasized the importance of having an original. N.T. Closing Arguments, 10/21/16, at 6, 9-10. The Maleys emphasized that they did not sign the Shell document. *Id.* at 13.

- 43 -

The trial court instructed the jury that "Pennsylvania law does allow a company to make a photocopy of a document and use the photocopy to the same extent as it would use the original. A company that has made a photocopy is not required to keep the original document." N.T. Jury Instructions, 10/21/16, at 24, R.R. at 791a.

The Maleys contend that the court erred by overruling their objections to the jury instruction regarding the Photographic Copies Act. Maleys' Brief at 52. In their view, there was insufficient basis to invoke the act and thus instruct the jury. *Id.* Specifically, the Maleys contend that under the Uniform Business Records as Evidence Act, 42 Pa.C.S. § 6108, Shell had the burden of establishing the trustworthiness of the photocopy, but failed to fulfill that burden. *Id.* at 54-55. The Maleys reiterate that the lease was notarized without the notary witnessing the signatures and that the original lease was printed on the letter-sized paper. *Id.* at 56.

In sum, the Maleys insist as follows:

[the charge] went to the most fundamental issues in the case: that Shell did not have the original lease and the "Shell document" was not the original lease the Maleys' agreed to and signed. The trial court essentially told the jury that [Shell] had no responsibility to preserve the Maleys' lease in its original condition. [Shell was] not required to explain why they did not produce the original lease document. Nor were they required to prove that the photocopy was an accurate reproduction of the Maleys' original lease. The erroneous instruction misled the jury to believe that the "Shell document" was equivalent to the Maleys' original lease. The jury was further misled to believe that the "Shell document" which contains *inter alia* fraudulent notarizations, was not a basis to find fraud or negligence against

[Shell]. Since the photocopy is considered the same as the original there can be no harm.

*Id.* at 61-62.

Shell counters that the trial court's instruction was proper and even assuming otherwise, the issuance of the instruction was harmless error. Shell's Brief at 43. Shell explains the instruction was proper because it had overcome the Maleys' prior arguments that the lease was hearsay and lacked proper authentication. *Id.* As for harmless error, Shell points out that the court did not order "the jury that it had to accept the [l]ease as valid or enforceable." *Id.* Rather, according to Shell, the instruction properly conveyed to the jury that the absence of an original lease did not permit the jury to presume liability. *Id.* at 44-45.

The standard of review follows:

In reviewing a claim regarding error with respect to a specific jury charge, we must view the charge in its entirety, taking into consideration all the evidence of record to determine whether or not error was committed. If we find that error was committed, we must then determine whether that error was prejudicial to the complaining party. Error will be found where the jury was probably misled by what the trial judge charged or where there was an omission in the charge which amounts to fundamental error.

Error in a charge is sufficient ground for a new trial, if the charge as a whole is inadequate or not clear or has a tendency to mislead or confuse rather than clarify a material issue. A charge will be found adequate unless the issues are not made clear to the jury or the jury was palpably misled by what the trial judge said or unless there is an omission in the charge which amounts to fundamental error. A reviewing court will not grant a new trial on the ground of inadequacy of the charge unless there is a prejudicial omission of something basic or fundamental.

- 45 -

The court is vested with substantial discretion in fashioning the charge and may select its own language cognizant of the need to adequately apprise the jury of the law as it applies to the evidence adduced at trial. Unless the language the court chose incorrectly states the law or mischaracterizes the evidence in a way that prejudiced the jury's consideration and thereby undermined the accuracy of the verdict, we will not interfere with the court's exercise of discretion.

*Braun*, 24 A.3d at 968 (citations omitted). "The purpose of a jury charge is to clarify the legal principles at issue. Thus, a jury instruction will be upheld if it accurately reflects the law and is sufficient to guide the jury in its deliberations." *Machado v. Kunkel*, 804 A.2d 1238, 1244 (Pa. Super. 2002) (citation omitted).

The instruction was based on the Photographic Copies Act, which follows in pertinent part:

> If any business institution . . . in the regular course of business or activity, has kept or recorded any memorandum, writing, entry, print, representation, or combination thereof, of any act, transaction, occurrence or event, and in the regular course of business has caused any or all of the same to be recorded, copied or reproduced by any photographic, photostatic, microfilm, microcard, miniature photographic, or other process which accurately reproduces or forms a durable medium for so reproducing the original, the original may be destroyed, in the regular course of business, unless its preservation is required by law. Any such reproduction in order to comply with this section must accurately reproduce all lines and markings which appear on the original. Such reproduction, when satisfactorily identified, is as admissible in evidence as the original itself in any judicial or administrative proceeding, whether the original is in existence or not, and an enlargement or facsimile of such reproduction is likewise admissible in evidence if the original reproduction is in existence and available for inspection under direction of the tribunal. The introduction of a reproduced record, enlargement or facsimile does not preclude admission of the original.

42 Pa.C.S. § 6109(b).[28]

Section 6109 is a statutory analogue to Pa.R.E. 1002, as each permits the use of a copy in place of an original. **See** Pa.R.E. 1002; **see generally** Leonard Packel & Anne Bowen Poulin, 1 West's Pa. Practice, Evidence § 1002-1 (4th ed. 2013). Just because section 6109 **permits** the admission of a duplicate does not mean the duplicate is not subject to Pennsylvania Rule of Evidence 1003.

Pennsylvania Rule of Evidence 1003 states that a "duplicate is admissible to the same extent as the original unless a genuine question is raised about the original's authenticity or the circumstances make it unfair to admit the duplicate." Pa.R.E. 1003. As the comment to the rule notes, "various Pennsylvania statutes have treated some accurate copies as admissible," including copies of business records under Section 6109. **Id.** cmt.

> The extension of similar treatment to all accurate copies seems justified in light of modern practice. . . . As a result, Pa.R.E. 1003 should tend to eliminate purely technical objections and unnecessary delay. In those cases where the opposing party raises a genuine question as to authenticity or the fairness of using a duplicate, the trial court may require the production of the original under this rule.

---

[28] The statute was enacted in 1976, prior to the 1998 adoption of the Pennsylvania Rules of Evidence. The comment to Section 6109 states that it is substantially similar to 28 P.S. §§ 141 and 143, the statutory predecessors, which were enacted in 1951. 42 Pa.C.S. § 6109 cmt.

***Id.*** cmt.

One treatise discusses the interplay between Rule 1003, *i.e.*, under the
facts of this case, 42 Pa.C.S. § 6109, and Rule 1008:

> There is some question about how the rule will operate, at least
> in some situations. Assume that a witness testifies that a
> document is a photocopy of the original document. The photocopy
> would be admissible as a duplicate under Pa.R.E. 1003. But
> assume that the opposing party objects and offers a witness who
> will testify that the alleged original document never existed or that
> the alleged duplicate's content is different than the original. The
> photocopy would not be admissible under the common law rule,
> but the outcome is not clear under Pa.R.E. 1003. If this testimony
> presents a genuine question as to the authenticity of the original,
> Pa.R.E. 1003 seems to suggest that the photocopy is not
> admissible. However, Pa.R.E. 1008 seems to suggest that this
> type of issue is to be resolved by the jury. Probably, the court
> should follow the approach provided in Pa.R.E. 1008 and decide
> only whether there is sufficient evidence to support a finding that
> the photocopy is a duplicate of the original. If not, the alleged
> duplicate should be excluded. If the court finds there is sufficient
> evidence to support a finding that it is a duplicate, the court should
> admit the alleged duplicate and leave the question of authenticity
> to the jury. This result would be consistent with Pa.R.E. 104(b).

Leonard Packel & Anne Bowen Poulin, 1 West's Pa. Practice, Evidence § 1003-
1 (4th ed. 2013); ***see also id.*** § 1008-1.

Here, no party disputes that the Shell document was a copy. All parties,
the court, and the jury were aware that the original lease was lost and the key
issue was whether the photocopied Shell document accurately depicted the
original lease. ***See, e.g.***, N.T. Closing Arguments, 10/21/16, at 6, 9-10, 13;
Maleys' Trial Ex. 4; Shell's Trial Ex. 5. The disputed jury instruction generally
tracks the language of section 6109. ***Compare*** N.T. Jury Instructions,
10/21/16, at 24, ***with*** 42 Pa.C.S. § 6109. Because it accurately reflects the

law, we cannot conclude the trial court erred in its framing of the jury charge on the Photographic Copies Act. *See Machado*, 804 A.2d at 1244.

Additionally, the instruction did not mislead the jury into believing it must accept the photocopy as authentic. The instruction advised the jury that a company is permitted to use a photocopy and is not required to keep an original. *See* N.T. Jury Instructions, 10/21/16, at 24, R.R. at 791a. The disputed instruction did not—contrary to the Maleys' arguments—instruct the jury that the Shell document was "equivalent to the Maleys' original lease." *See* Maleys' Brief at 61-62.

Moreover, even assuming the court erred by either issuing the instruction or by omitting an additional instruction about authenticity, we discern nothing in the charge that ultimately undermined the accuracy of the jury's verdict. *See Braun*, 24 A.3d at 968. Both parties introduced the photocopied Shell document into evidence. *See* Maleys' Trial Ex. 4; Shell's Trial Ex. 5. Both parties presented testimony and evidence addressing whether the Shell document was an accurate, authentic duplicate of the original. *See, e.g.*, R.R. at 651a, 684a-85a. It was left for the jury to ascertain whether the Shell document was, in fact, an accurate depiction of the original lease. *See* Pa.R.E. 1008; *Hatfield*, 685 F. Supp. 2d at 320; *Dietrich*, 126 F. Supp. 2d at 764; Leonard Packel & Anne Bowen Poulin, 1 West's Pa. Practice, Evidence §§ 1004-1, 1008-1 (4th ed. 2013). The jury elected to reject the Maleys' claim that the Shell document was not the lease

the Maleys signed and that their signatures were fraudulently placed on the Shell document. For these reasons, we perceive no error, let alone prejudicial error, that would warrant the grant of a new trial. ***See Braun***, 24 A.3d at 968.

## IV. Failure to Order the Recorder of Deeds to Remove Fraudulent Lease

Briefly, by way of background, following the jury's verdict, the Maleys' counsel stated the following:

> [Maleys' counsel]: Your Honor, I have a question with regard to the equitable relief that we've asked for in this case; and, in particular, the, the underlying Shell document that we, we would ask this Court to recognize the Jury's finding and make a determination as to whether the [pertinent Shell document] that have been filed in the Recorder of Deeds Office can be removed, or found to -- I'm not sure of the exact terminology, but to have that record corrected.

R.R. at 802a. The court deferred its ruling pending the filing of a formal motion and response by the parties. ***Id.***

The Maleys subsequently filed a post-trial motion requesting, among other things, that the trial court award equitable relief in the form of compelling Shell to execute the following:

> a) surrender the "[S]hell document"; (b) file appropriate documentation with the Tioga County Recorder of Deeds confirming that any oil and gas lease (including "units") between the [Maleys] and [Shell] is void; and (c) file appropriate documentation with the Tioga County Recorder of Deeds withdrawing the memorandum of lease filed February 9, 2006, which was falsely notarized by Dale Tillinghast and which the [Maleys] denied signing.

R.R. at 881a; *id.* at 888a. The Maleys requested a new trial in the alternative. *Id.* The Maleys did not request the trial court to order the Recorder of Deeds to strike the documents. *Id.*

On appeal, the Maleys claim that Tillinghast admitted to violating the Uniform Acknowledgement Act (UAA)[29]—by not personally observing the Maleys sign the lease. Thus, for the first time on appeal, the Maleys assert the trial court should have ordered the Recorder of Deeds to remove it. Maleys' Brief at 78-79. According to the Maleys, the trial court denied their

_____

[29] 21 P.S. § 351. The UAA states in pertinent part:

> All deeds, conveyances, contracts, and other instruments of writing wherein it shall be the intention of the parties executing the same to grant, bargain, sell, and convey any lands, tenements, or hereditaments situate in this Commonwealth, upon being acknowledged by the parties executing the same or proved in the manner provided by the laws of this Commonwealth, shall be recorded in the office for the recording of deeds in the county where such lands, tenements, and hereditaments are situate. Every such deed, conveyance, contract, or other instrument of writing which shall not be acknowledged or proved and recorded, as aforesaid, shall be adjudged fraudulent and void as to any subsequent bona fide purchaser or mortgagee or holder of any judgment, duly entered in the prothonotary's office of the county in which the lands, tenements, or hereditaments are situate, without actual or constructive notice unless such deed, conveyance, contract, or instrument of writing shall be recorded, as aforesaid, before the recording of the deed or conveyance or the entry of the judgment under which such subsequent purchaser, mortgagee, or judgment creditor shall claim.

21 P.S. § 351.

alleged request because Shell was a bona fide purchaser, but they identify several reasons that Shell is not a bona fide purchaser. *Id.* at 79-81.

Pennsylvania Rule of Appellate Procedure 302 states that "[i]ssues not raised in the lower court are waived and cannot be raised for the first time on appeal." Pa.R.A.P. 302(a). "It is well settled that issues not raised below cannot be advanced for the first time in a 1925(b) statement." *Irwin Union Nat'l. Bank & Trust Co. v. Famous*, 4 A.3d 1099, 1104 (Pa. Super. 2010). Similarly, a failure to present authority demonstrating entitlement to relief results in waiver. *Price v. Pa. Prop. & Cas. Ins. Guar. Ass'n*, 795 A.2d 407, 412 (Pa. Super. 2002); *see also* Pa.R.A.P. 2119(a).

Here, the Maleys have argued that the trial court erred by not ordering the Recorder of Deeds to remove the alleged fraudulent deed. Maleys' Brief at 78-79. The Maleys did not raise that request for relief with the trial court below. Rather, the Maleys contended that the trial court compel Shell to file appropriate documents to have the Recorder of Deeds void the lease. R.R. at 881a, 888a. It is one thing for a trial court to order a party to file appropriate documents. It is a different thing entirely for a trial court to directly compel another governmental entity to remove a public record.[30] Therefore, the Maleys waived this issue because they are requesting relief for the first time

---

[30] This is not an action to quiet title.

- 52 -

on appeal that they did not seek from the trial court. ***See Famous***, 4 A.3d at 1104.[31]  In any event, the Maleys have not identified any legal authority in their brief permitting the trial court to order the Recorder of Deeds to strike the lease at issue. ***See Price***, 795 A.2d at 412.  For these reasons, the Maleys have not established entitlement to relief for this issue.[32]  Based on the foregoing, we perceive no abuse of discretion by the trial court and therefore affirm the judgment below.

Judgment affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/18/2018

---

[31] We acknowledge that the trial court addressed the issue on its merits in its Pa.R.A.P. 1925(a) decision.  But a trial court's decision to address an unpreserved issue does not save it for appellate review. ***See Dilliplaine v. Lehigh***, 322 A.2d 114, 116 (Pa. 1974) ("Appellate court consideration of issues not raised in the trial court results in the trial becoming merely a dress rehearsal.").

[32] Moreover, the Maleys have not identified where in the record that the court held the lease was void.  Thus, it remains unclear to this Court whether the Maleys have fulfilled the predicates for requesting the trial court to order the Recorder of Deeds to strike a deed.  Further, even assuming the lease is "void" as to John C. Maley, the Maleys have not addressed the validity of the lease as to John J. Maley, the other lessor.  The rights and liabilities, if any, of John J. Maley have not been addressed.  No trier of fact has concluded that John J. Maley was improperly compelled or induced to sign the lease.